[Cite as *State v. McLaughlin*, 2015-Ohio-4611.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO

      Plaintiff-Appellee

v.

BONNIE N. McLAUGHLIN

      Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:

C.A. CASE NO. 26521

T.C. NO. 13CRB11911

(Criminal appeal from
  Municipal Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of _____November_____, 2015.

. . . . . . . . . . .

COLLEEN EGAN, Atty, Reg. No. 0083961, Assistant City Prosecutor, 335 W. Third Street, Rm. 372, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

KIRIAKOS G. KORDALIS, Atty. Reg. No. 0089697, 130 W. Second Street, Suite 1818, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Bonnie N. McLaughlin, filed December 11, 2014. McLaughlin appeals from the November 25, 2014 Decision of the Dayton Municipal Court finding her guilty, following a bench trial, of one count of obstructing official business, in violation of R.C. 2921.31(A), a misdemeanor of the second degree, and one count of falsification, in violation of R.C. 2921.13(A)(3), a

misdemeanor of the first degree. McLaughlin was sentenced to 90 days for obstructing official business, she received 8 days of credit, and 82 days were suspended. She received 180 days for falsification, with 8 days of credit, and 172 days were suspended. The court imposed 18 months of basic "no breaks" community control sanctions. We hereby affirm the judgment of the trial court.

{¶ 2} McLaughlin was charged by way of complaint on December 3, 2013, and she entered a plea of not guilty on December 30, 2013. A trial was held on October 20, 2014. Officer William Gross testified that he is a City of Dayton police officer, having been so employed for 13 years. According to Gross, on December 29, 2013, around 12:17 p.m., he was in the uniform of the day and in a marked cruiser, on routine patrol at the intersection of Dandridge and Huron Avenues, when he observed two vehicles, namely a rental car, with the driver's window down, and a Plymouth, parked "driver's door to driver's door," in the 900 block of Huron Avenue. Gross testified that the area is known for drug activity. Gross testified as follows:

> * * * As soon as I pulled up the rental car took off and that's when the driver, a Steven, got out of the Plymouth and came walking over to me and said, hey, did you know that guy and I go no. Well he just pulled a gun on me and I said really. I was like, he wasn't over here buying no drugs or anything? He goes no and I go let me run those tags and see what kind of FI's pop up. As soon as I said that he takes off running. I was already running the tag and it pops back, car stolen. * * *.

{¶ 3} At the time, Gross testified that McLaughlin had exited the Plymouth and was standing on the sidewalk. Gross stated that he "backed my cruiser up to shoot down

the alley and at the same time calling dispatch letting them know here is what I have * * *." He stated that as he proceeded down the alley after "Steven," he observed McLaughlin "cutting through some houses." The following exchange occurred regarding McLaughlin's conduct:

A. Starting to cut through the houses in the nine hundred block of Huron to head east towards and I think the next street over was Westwood, heading that way. Well, I know she is cutting through those houses so I stop, thinking, I don't want her going back to get in the stolen car and driving off. So, I shoot back around to the stolen vehicle, down Dandridge, right there is, pretty much right on the intersection corner there. (sic).

Q. Why were you concerned about the vehicle, the stolen vehicle that was left there?

A. Well it has already been stolen. So, it's either the ignition is popped and it's running and it is easy for her to hop in and take off and I don't have the stolen vehicle anymore. And then, you know, at least I can recover the vehicle and get it back to the owner. So, when I come back around the corner Bonnie is walking towards the car, sees me, stops, and turns around.

Q. How do you know she saw you?

A. Because she stopped, you know, she's walking and as soon as she sees the cruiser come, she stops, does a one-eighty, and starts walking the other direction.

Q. And what did you do then?

A.   At that time I got on my P.A. system, told her to stop if you don't want to be bitten by my dog.

Q.   What did she do in response?

A.   She stopped, turned back around, and looked at me.

Q.   And did she make eye contact with you?

A.   I would say eye contact but she stopped, turned around, I'm the only vehicle there, the only cop car there, no one else, and then she turns right back around and starts walking again.  I give here one more command, you need to stop walking.  She continues on so I drive down, cut her off, and cuff her up.

Q.   Now, when you're talking over the P.A. system, stop or, if you don't want to be bit by my dog or stop walking, was there anybody else in the area?

A.   No.

* * *

Q.    * * * How do you end up cutting her off?

A.   I drove my cruiser down there, pulled it on the sidewalk, cut her off, jumped out, and placed handcuffs on her.

Q.   Okay and then what did you do with her?

A.   I placed her in the back of my cruiser. Other crews have already started arriving in the area.   I asked, I think it was crew twenty-three, Officer Thornton and Miller, if they would watch her so I can go and start looking for the (sic), who turned out to be Steven.   Because by that time citizens

have already come out, you know, because of all the commotion, P.A., and the cops and dogs. They have already come out and they were actually directing me as to where he was at and we had detectives at that time who were in the area also helping look for –

* * *

A. The driver.

Q. So, after looking for the driver, did you have any further contact with Miss McLaughlin?

A. Yes, after the driver stuff is taking (sic) care of I came back to my cruiser to, you know, deal with that. I asked her why she was over here and she stated she was waiting for her uncle Patch who, you know, drives for Hollis. Well, Patch also worked for, he used to work for Summit Towing, which tows for the City of Dayton and I know him. I also know him personally through my father's business, that, you know, he ran.

Q. * * * So, what did she tell you about waiting on her Uncle Patch?

A. That she was waiting on her Uncle Patch to come over and that was it. And I asked, well, where is he at? And she said, well, I think he must have took a tow or something. And I said well, if you are waiting for him why would he start towing cars if he is supposed to meet you over here because, you know, why would he start, be towing if he was meeting you? It makes no sense. And then * * * she stated that she would be willing to tell me anything I wanted to know about Steven.

Q. * * * What else did she say regarding her Uncle Patch?

A. Eventually she said I just want to give him a call and she said basically that I, I lied about, you know, what I said about my Uncle Patch.

Q. So, you offered to call Patch?

A. Yes.

Q. Okay and why did you offer to call her Uncle Patch?

A. To confirm her story.

Q. Okay and what did she say when you offered to confirm her story?

A. That she lied.

Q. Did she explain why she lied?

A. No.

Q. I want to go and why were you trying to confirm her story for? (sic)

A. Well, to see if that truly (sic) the nature of why she was over there to meet her Uncle Patch. Then I guess why would she be in a stolen car?

THE DEFENSE: I'm going to object Your Honor, that's not responsive to the question.

THE COURT: Sustained.

Q. Why did you need to confirm her story regarding her Uncle Patch?

A. To see if she's being honest and truthful.

Q. And why did it matter if she was there waiting for her Uncle Patch?

A. Because if she was being honest then she wasn't lying to me. The whole purpose of her being there was to meet Patch for whatever reasons, then being in the stolen car, obviously, still has to be dealt with * * * .

Q. Do you think, did that have any, do you believe that might have any bearing on the stolen car issue possibly?

A. Meeting her uncle?

Q. Yeah, like her, like regarding her story about meeting her uncle.

A. I don't know if it had any bearing on the stolen car. I think, honestly, that she might have, because Patch has driven tow trucks for the City of Dayton basically and maybe thinking, oh, your (sic) friends with Patch - -

THE DEFENSE: I'm going to object Your Honor.

THE COURT: Sustained.

THE DEFENSE: This is speculation.

THE COURT: Yes.

THE DEFENSE: And it's not –

THE COURT: Sustained.

Q. Were you still investigating at that point?

A. Yes.

Q. And I want to go, divert your attention back to when she was walking away from you. How long did it take you from when you first told her to stop, how long did it take you to get her to * * * stop basically?

A.   Based from the time I told her to stop until when she looks at me and then turns back around and starts walking away again, now I got to drive down there, probably forty five seconds because I was in my cruiser.

* * *

Q.   Okay, when you were trying to stop her were you able to still look for that driver?

A.   At the, not at the time that I stopped her because I'm dealing with her, so then he's out running around.

**{¶ 4}** On cross-examination, Gross stated that McLaughlin was out of the vehicle at the time that he learned the vehicle was stolen, and that after he "did my broadcast on the radio, she already had started walking * * *." Gross stated that at the time he was proceeding down an alley parallel to Huron Avenue after the driver, McLaughlin was "cutting through the yards." Gross stated that he thought "well maybe she is going to go back to that stolen car and then drive off. So, when I come back around she is walking towards that stolen car * * * as I expected, that maybe she was going to hop in and drive off." According to Gross, McLaughlin stopped upon observing him and did "a one eighty" and walked in the "opposite direction." After being advised to stop, he stated that she stopped and turned to look at him and then turned back around and started walking. The following exchange occurred:

A.   Once again, I say you need to stop –

Q.   Mm-hmm.

A.   She doesn't. I drive my car down, cut her off with my cruiser, hop out, place handcuffs on her, and place her in the back of my car.

Q.   * * * Now, so, that was your initial contact with her, is that right?

A.   That would be my initial contact –

Q.   And then –

A.   Putting handcuffs on her.

Q.   She got out of the car and start walking away and you had not had any contact with her prior to that, is that right?

A.   That would be correct.

{¶ 5}  Gross stated that McLaughlin stopped "[a]fter I went and physically stopped her" by means of his cruiser.  When asked why he stopped her, Gross responded, "Because I wanted to, what I perceived to be a drug deal, in my thirteen years of experience and knowing what usually drug deals look like.  (sic)  I wanted to see what her answer was and I wanted to know why she was there and also in a stolen car –".  Gross stated that after McLaughlin advised him that she was there to meet her uncle, he indicated that he would phone the uncle, with whom Gross is acquainted, and at that point, McLaughlin advised him that she lied about being there to meet her uncle.  Gross testified that McLaughlin "ended up being arrested for obstructing official business."  When asked what he was obstructed in doing, Gross responded, " Well, at the time I had a stolen vehicle, she exited the stolen vehicle, she was going back to the stolen vehicle, saw me, and she turns back around and was walking away from the stolen vehicle.  So, I'm trying to detain her because I'm doing an investigation on a stolen vehicle."  When he placed McLaughlin in handcuffs and into the cruiser, Gross testified that at that time "she was being detained because we were still trying to get the driver."

{¶ 6}  In finding McLaughlin guilty of both charges, the court determined as follows

from the bench:

The court listening to the testimony of the officer, the officer indicated as to the testimony that she exited the vehicle, she ran through some houses, and she came back toward the cruiser. He ordered her to stop, she does a one hundred and eighty degree, then she starts walking again, he gets in his cruiser, and he has to cut her off with his cruiser.

The court believes that its, it is something to hamper [and] impede, whether it is diminimus (sic) or not, it is something that she did to hamper him. She didn't have any duty to say anything to him but she did have the duty once he ordered her to stop and she didn't do that. Therefore, the court finds the Defendant guilty of the obstructing official business.

As to the falsification, she, the officer testified that she said she lied. Without anything else, no testimony from her, all I can accept is what the officer statement as true (sic) is that she said she lied about Uncle Patch. Therefore, the court is going, and I do believe it was a lie to mislead the officer on the stolen vehicle and the nature of all of the activity there. Therefore, the court is going to find you, Miss McLaughlin, guilty of both counts. * * *

{¶ 7} McLaughlin asserts two assignments of error herein. Her first assigned error is as follows:

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE THAT DEFENDANT PERFORMED AN AFFIRMATIVE ACT THAT ACTUALLY HAMPERRED OR IMPEDED PUBLIC OFFICIALS IN THE

PERFORMANCE OF THEIR DUTIES REGARDING THE OBSTRUCTING OFFICIAL BUSINESS CHARGE.

**{¶ 8}** McLaughlin asserts that at trial "no testimony was offered to demonstrate that she committed an overt act that hampered or impeded Officer Gross's investigation." She asserts that being cut off by the cruiser and placed in handcuffs by Gross was "the first interaction between Officer Gross and Ms. McLaughlin since the officer approached the two parked vehicles.   After Ms. McLaughlin was in handcuffs Officer Gross asked her what she was doing there.   Ms. McLaughlin initially responded that she was waiting for her uncle Patch but quickly recanted this after being further questioned by the Officer." According to McLaughlin, merely "failing or refusing to respond to an officer's requests does not constitute obstructing official business.   * * * Ms. McLaughlin simply failed to respond to the officer's request and in no way hampered or impeded Officer Gross's investigation."   McLaughlin asserts that her "refusal to stop for the officer did not constitute an affirmative act that can support a conviction for obstructing official business," in reliance upon *State v. Crowell*, 189 Ohio App.3d 468, 2010-Ohio-4917, 938 N.E.2d 1115 (2d Dist.).   McLaughlin argues that failing to stop for the officer "had no effect on the investigation of the individual that had run away," and she "was never told that she could not leave the scene where the stolen car was found."   McLaughlin argues as follows:

> Further, Ms. McLaughlin telling the officer a lie that she was waiting
> for her [U]ncle Patch did not hamper or impede the investigation.   From the
> record of the proceedings there is no evidence to support that this statement
> was made with the intent to hamper or impede the investigation.   It was

clear to Officer Gross knew (sic) that this statement had no bearing on the stolen car. * * * Further, there was no testimony offered that Ms. McLaughlin's statements actually had the effect of hampering or impeding the investigation.

{¶ 9} The State responds as follows:

The surrounding facts and circumstances prove Appellant's purpose to hamper Officer Gross's investigation. Appellant was found in a stolen vehicle during a suspected drug transaction. Appellant did not just turn and walk away from Officer Gross once, but twice and then continued walking away despite Officer Gross's repeated command for her to stop. Then, after she is arrested, Appellant lies to Officer Gross with a story about why she was in that area. All of these actions by Appellant show a pattern of attempting to hamper and impede Officer Gross's investigation.

Officer Gross testified that while he was dealing with Appellant walking away from him, her not stopping when he told her, cutting her off with his cruiser, handcuffing her and placing her in the custody of other officers, he was unable to go after the driver of the stolen vehicle who had fled from him or to continue to investigate the stolen vehicle. There is no doubt that while Officer Gross had to chase after Appellant, he was hampered and in fact unable to perform his duty as a police officer which was to investigate the theft of the vehicle.

{¶ 10} As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the

defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

*State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 26.

{¶ 11} R.C. 2921.31(A) provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2901.22(A) provides in part that a "person acts purposely when it is the person's specific intention to cause a certain result * * *." "Because no one can know the mind of another, a defendant's intent is 'not discernible through objective proof.' * * * Rather, a defendant's intent in acting must be 'determined from the manner in which it [the act] is done, the means used, and all other facts and circumstances in evidence.' * * * ." *State v. McCoy,* 2d Dist. Montgomery No. 22479, 2008-Ohio-5648, ¶14.

{¶ 12} In *Crowell*, upon which McLaughlin relies, this Court reversed the

defendant's conviction for obstructing official business based upon insufficient evidence. The evidence demonstrated that when officers were dispatched to the defendant's home in response to a 9-1-1 call, they observed the front door of the home standing open and a distraught woman outside, unable to consent to the officer's entering the home to speak with the defendant or to check on the welfare of her child. *Id.*, ¶ 2. The officers yelled repeatedly for the defendant to come outside, and they observed him walk past the open door. *Id.*, ¶ 3. The defendant refused repeated demands to exit his home, and he closed the door to the officers. *Id.* The officers then observed the defendant "walk to the master bedroom. They went to that window and ordered [him] to climb out the window." *Id.*, ¶ 4. After initially refusing, and after being "threatened with tasering," the defendant climbed out the window. *Id.* "When asked why he did not come out the front door when first asked, [the defendant] claimed not to have heard the officers. [He] denied closing the door, and he claimed that he had been asleep until the baby started crying. The officers found the child safe and asleep when they entered the home * * *." *Id.*

{¶ 13} This Court noted as follows:

> * * * " 'Ohio courts have consistently held that in order to violate the obstructing official business statute a defendant must engage in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's duties.' " * * * A mere failure or refusal to respond to an officer's request does not constitute obstructing official business. * * *.

*Id.*, ¶ 11 (Citations omitted).

{¶ 14} This Court concluded in *Crowell* that the defendant's "initial refusal to come

out of his home amounts to no more than a failure or refusal to respond to an officer's request; it does not constitute an affirmative act that could support a conviction for obstructing official business." *Id.* Regarding the defendant's closing the front door of his home, this Court determined that, "while arguably an affirmative act under certain circumstances, here it amounted to no more than a continued refusal to cooperate with the officers." *Id.*, ¶12. This Court further found that even "if it was an overt act, the state must prove not only the commission of an overt act done with an intent to obstruct the officers, 'but it must also must prove that [the defendant] succeeded in actually hampering or impeding them.' " *Id.* (Citations omitted). This Court concluded that there "was no evidence offered to show that [the defendant's] action of closing the front door had the effect of hampering or impeding the investigation of the officers, all of whom were standing 20 to 25 feet away. To the contrary, upon seeing [the defendant] move to the master bedroom, the officers went to the bedroom window" and convinced the defendant to climb out the window. *Id.* Finally, regarding the defendant's false statements, this Court noted that the "making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. * * * 2921.31(A)," * * * but, "assuming, arguendo that [the defendant] did lie to the officers, there is no evidence in the record that his statements were made with an intent to hamper or impede the investigation, and certainly no evidence that his statements actually had the effect of hampering or impeding the investigation." *Id.*, ¶13.

{¶ 15} As this Court has further noted:

Before it can be said that a police officer was hampered or impeded,

"there must be some substantial stoppage of the officer's progress." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, at ¶17 (Citation omitted.). But there is no "finite period of time [that] constitutes a 'substantial stoppage.' * * * If the record demonstrates that the defendant's act hampered or impeded the officer in the performance of his duties, the evidence supports the conviction." *Id.*, at ¶18 (Citations omitted).

*State v. Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967, ¶ 59. "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *Wellman*, ¶12.

{¶ 16} Viewing the evidence in a light most favorable to the State, we conclude that McLaughlin's conviction for obstructing official business is supported by sufficient evidence. When Officer Gross observed two vehicles parked "driver's door to driver's door," in an area known for drug activity, he suspected, based upon his experience, that a drug transaction was in progress. When he approached to investigate, the rental car fled the scene, and the driver of the Plymouth approached his vehicle on foot and advised him that the driver of the rental car was armed. Upon learning that Gross was running the plates on the Plymouth, the driver fled on foot, and Gross pursued him to investigate the stolen vehicle. Upon observing McLaughlin, who had exited the Plymouth, begin "cutting through some houses," Gross became concerned that she would go back to the stolen vehicle and drive away, and he returned to the area of the Plymouth to find McLaughlin approaching the vehicle.

{¶ 17} Upon seeing Gross, McLaughlin turned and headed away from the cruiser.

Gross immediately advised her to stop, and after turning around and looking at Gross, she continued walking away in violation of his order to stop. Gross again advised McLaughlin to stop, and she continued walking away until Gross physically stopped her by means of his cruiser. Unlike the defendant in *Crowell*, who remained at the scene of the investigation and ultimately complied with the officers' requests to exit the home, we conclude that walking away despite being ordered repeatedly to stop in the course of Gross's investigation of the stolen vehicle constitutes an affirmative act or undertaking that impeded Gross's ability to perform his duty. Gross testified that McLaughlin's conduct impeded his pursuit of the driver of the stolen car, and that in the time it took for him to stop her and secure her with another responding unit, the driver of the Plymouth was "out running around." As the trial court noted, the effect of McLaughlin's conduct was de minimis, but the record nevertheless demonstrates that McLaughlin's act of walking away impeded Gross's investigation of the stolen Plymouth. For the foregoing reasons, McLaughlin's first assignment of error is overruled.

{¶ 18} McLaughlin's second assignment of error is as follows:

THE STATE FAILED TO PRESENT SUFFICIENT EVIIDENCE TO WARRANT A CONVICTION AND THE DECISION OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE REGARDING THE FALSIFICATION CHARGE.

{¶ 19} In addition to the standard of review applied to a challenge to the sufficiency of the evidence, as set forth above, this Court has noted:

When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court reviews the entire

record, " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " [*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997)], quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Essentially, a reviewing court "sits as a 'thirteenth juror' and makes its own independent review of the evidence and inferences derived therefrom, and assesses and weighs the credibility of each witness's testimony." Hagel, Ohio's Criminal Practice and Procedure (2006-07) 796, Section 41.207. However, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. * * * "

*State v. Williamson*, 2d Dist. Montgomery No. 21709, 2007-Ohio-3820, ¶ 11.

{¶ 20} R.C. 2921.13 proscribes falsification as follows: "(A) No person shall knowingly make a false statement * * * when any of the following applies: * * * (3) The statement is made with purpose to mislead a public official in performing the public official's official function." The Supreme Court of Ohio has stated that "the making of an

unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A)." *State v. Lazzaro*, 76 Ohio St.3d 261, 667 N.E.2d 384 (1996), syllabus.

{¶ 21} McLaughlin asserts that she made the statement that she was present in the area to meet her uncle "in hopes of garnering favor with" Gross, who was also acquainted with McLaughlin's uncle. According to McLaughlin, Gross "acknowledged the fact that Ms. McLaughlin more likely than not made this statement hoping to massage the situation she was in by name-dropping her uncle. Officer Gross stated as much by stating this on direct, 'and maybe thinking, oh, your friends with Patch.' " McLaughlin asserts that "there was no testimony offered by Officer Gross on direct examination that he was actually misled by this false statement. Nothing to the effect that this statement led them down a wrong path or that it diverted their attention from the actual investigation."

{¶ 22} The State responds that defense counsel objected to the testimony upon which McLaughlin relies, and the court sustained the objection since "the officer was speculating and did not actually know. * * * Thus, [McLaughlin] cannot now try and use that testimony to explain [her] purpose." According to the State, "the evidence was sufficient to sustain a conviction for Falsification and given that was the only evidence presented, there is no other evidence to weigh against Officer Gross's testimony and this Court should overrule this assignment of error."

{¶ 23} Gross testified that McLaughlin told him that she was in the area to meet her uncle. When asked why her uncle was not present, McLaughlin further indicated that her uncle "must have took a tow or something." Gross testified that McLaughlin's

statement made "no sense" to him, and only when he offered to confirm her statement by calling the uncle, did McLaughlin admit that she lied to the officer. We agree with the State that McLaughlin's reliance upon Gross's speculative testimony regarding McLaughlin's motive in lying, namely to gain favor with Gross, is misplaced; the court sustained defense counsel's objection to his testimony. We note that the court had the opportunity to observe Gross in the course of his testimony, and the court found him to be credible in testifying that McLaughlin admitted that she lied about the reason she was in the area. McLaughlin did not testify, and in the absence of evidence contrary to Gross's testimony, we conclude that the trial court correctly determined that McLaughlin made the statement with a purpose to mislead Gross in his investigation regarding her presence in the stolen vehicle.

{¶ 24} Construing the evidence in a light most favorable to the State, we cannot conclude that McLaughlin's conviction for falsification is not supported by sufficient evidence. Having reviewed the entire record, and deferring to the trial court's assessment of credibility, we further cannot conclude that McLaughlin's falsification conviction is against the manifest weight of the evidence. Accordingly, McLaughlin's second assigned error is overruled.

{¶ 25} The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Colleen Egan
Kiriakos G. Kordalis
Hon. Deirdre E. Logan