[Cite as *State v. Pineda*, 2021-Ohio-1540.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | : | **CASE NOS. 2020-A-0011** |
| - vs - | : | **2020-A-0012** |
| CHRISTOPHER JOHN PINEDA, | : | |
| Defendant-Appellant. | : | |

Criminal Appeals from the Ashtabula County Court of Common Pleas.
Case Nos. 2018 CR 00733 and 2018 CR 00668.

Judgment: Affirmed.


*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, Ohio 44047 (For Plaintiff-Appellee).

*Wesley A. Johnston*, 1360 East Ninth Street, Suite 910, Cleveland, OH 44114 (For Defendant-Appellant).


MARY JANE TRAPP, P.J.

{¶1} In this consolidated appeal, appellant, Christopher John Pineda ("Mr. Pineda"), appeals his convictions for sexual imposition, obstructing official business, and domestic violence following jury trials in the Ashtabula County Court of Common Pleas.

{¶2} Mr. Pineda presents two assignments of error, contending that his convictions (1) were based on insufficient evidence and (2) were against the manifest weight of the evidence.

{¶3}   Within these two assignments of error, Mr. Pineda argues as follows:

{¶4}   (1) His conviction for sexual imposition was based on insufficient evidence because the state failed to present corroborating evidence as required by R.C. 2907.06(B).

{¶5}   (2) His conviction for obstructing official business was based on insufficient evidence because the state failed to prove that Mr. Pineda purposely prevented, obstructed, or delayed the officers' performance; that his actions hampered or impeded the officers; or that he created a risk of physical harm to the officers.

{¶6}   (3) His conviction for domestic violence was based on insufficient evidence because the state failed to prove that Mr. Pineda knowingly caused harm to the victim.

{¶7}   (4) His conviction for sexual imposition was against the manifest weight of the evidence because the victim's testimony was not credible.

{¶8}   (5) His conviction for domestic violence was against the manifest weight of the evidence because the victim's testimony was not credible.

{¶9}   After a careful review of the record and pertinent law, we find as follows:

{¶10}   (1) The evidence was sufficient to find Mr. Pineda guilty of sexual imposition beyond a reasonable doubt.  The state presented "slight circumstances or evidence that tends to support" the victim's testimony, pursuant to R.C. 2907.06(B).

{¶11}   (2) The evidence was sufficient to find Mr. Pineda guilty of obstructing official business beyond a reasonable doubt.  The state presented evidence that Mr. Pineda engaged in affirmative acts committed for the purpose of preventing, obstructing, or delaying his arrest; that his actions actually hampered or impeded his arrest; and that his actions created a risk of physical harm to himself and law enforcement.

{¶12} (3) The evidence was sufficient to find Mr. Pineda guilty of domestic violence beyond a reasonable doubt. The state presented abundant evidence that Mr. Pineda choked the victim, which was sufficient to support a finding that he was aware that his conduct would probably cause a certain result and, thus, that he knowingly caused or attempted to cause physical harm.

{¶13} (4) The jury did not clearly lose its way or create a manifest miscarriage of justice by finding Mr. Pineda guilty of sexual imposition. Taken as a whole, the inconsistencies in the victim's version of the events do not render her testimony completely incredible.

{¶14} (5) The jury did not clearly lose its way or create a manifest miscarriage of justice by finding Mr. Pineda guilty of domestic violence. The victim's allegations were supported by other evidence, including Mr. Pineda's admission, law enforcement testimony, and photos documenting physical injuries to the victim.

{¶15} Thus, we affirm the judgments of the Ashtabula County Court of Common Pleas.

### Substantive and Procedural History

{¶16} This matter involves two separate criminal cases which we consolidated, sua sponte, for purposes of appeal.

### Case No. 18 CR 00668

{¶17} In case no. 18 CR 00668, Mr. Pineda was convicted of sexual imposition involving Tina Cowell ("Ms. Cowell").

{¶18} On October 9, 2018, Ms. Cowell was babysitting Mr. Pineda's young step-grandchildren at the home of Mr. Pineda and his wife, Janice Fink ("Ms. Fink") in Monroe

3

Township, Ohio. According to Ms. Cowell, she and Ms. Fink are cousins, and she had been babysitting for Ms. Fink for about three to four weeks.

{¶19} Ms. Fink was at work, and Mr. Pineda arrived in the early morning hours after working third shift. According to Ms. Cowell, she was holding one of the children on the couch and kept hearing the back door alarm going off and on. Mr. Pineda came in staggering, tripped over the baby gate, and seemed to be intoxicated.

{¶20} Mr. Pineda sat down on the couch next to Ms. Cowell and played with one of the children. He got closer and began rubbing her leg. Ms. Cowell felt uncomfortable and moved toward the arm of the couch.

{¶21} At one point, Mr. Pineda remarked "too bad you're with someone, I would love to be with you." Mr. Pineda then touched her left breast and said he could feel her nipple through her shirt. Ms. Cowell became very uncomfortable and tried to move even further away from him. Mr. Pineda also tried to get Ms. Cowell to put the child down and go into another room with him.

{¶22} Ms. Fink began texting Ms. Cowell by phone and eventually spoke with her. Ms. Cowell sounded "distant" and as if something were bothering her, so Ms. Fink called the sheriff's department. According to Ms. Cowell, she did not feel comfortable calling the police herself because she did not know how Mr. Pineda would react.

{¶23} Mr. Pineda later testified regarding a different version of events. According to Mr. Pineda, he arrived home from work at about 8:30 a.m. He took his dogs out, went up to his room, and went in and out the back door. As he was coming out of the bathroom, he "got on" Ms. Cowell about why she had "told on him" the prior week for drinking, but

4

Ms. Cowell did not respond. He admitted to drinking "a beer and a half" on the day of the alleged incident but denied ever sitting next to Ms. Cowell on the couch or touching her.

{¶24} According to Deputy Daniels from the Ashtabula County Sheriff's Department, Ms. Fink called dispatch and stated that Mr. Pineda was inappropriately touching the babysitter. Dispatch advised that Mr. Pineda could be combative, so he and Sergeant Allen both responded to the scene.

{¶25} Upon arrival at the residence, Deputy Daniels walked toward the partially open front door and observed someone physically close it. He knocked, identified himself, and announced that the deputies would make entry if the door was not opened.

{¶26} Mr. Pineda eventually opened the door and stood in the porch area in the front of the house. According to Deputy Daniels, Mr. Pineda appeared intoxicated, as his speech was slurred, and he was unsteady on his feet. Deputy Daniels observed Ms. Cowell standing in the doorway of the house holding a small child. Ms. Cowell was shaking her head and mouthing to not let Mr. Pineda back in the house. Deputy Daniels went into the house and closed the door to speak privately with Ms. Cowell, and Sergeant Allen stayed on the porch with Mr. Pineda.

{¶27} While inside the house, Deputy Daniels interviewed Ms. Cowell regarding what happened. While speaking to her, he could hear voices getting louder on the porch. Deputy Daniels heard Mr. Pineda say, "f**k you, I'm going in, it's my house." He heard the door jiggle, but nobody came in. Deputy Daniels radioed Sergeant Allen and told him Mr. Pineda would be arrested. Based on his conversation with Ms. Cowell, Deputy Daniels determined that Mr. Pineda would be arrested on a charge of gross sexual imposition.

5

{¶28} Deputy Daniels heard Mr. Pineda say, "f**k you, you're trespassing, get out of my house," at which point he heard a scuffle on the porch. He opened the door, and Sergeant Allen had Mr. Pineda pinned against a bag of clothing with one arm handcuffed behind his back. Sergeant Allen took Mr. Pineda into custody in the back of the cruiser, and Deputy Daniels had Ms. Cowell complete a written statement.

{¶29} On the way to the jail, Mr. Pineda said that Deputy Daniels did not know who he was "messing with" and that Mr. Pineda's family would "get" Deputy Daniels once he got out of jail. When they arrived at the jail, Mr. Pineda was uncooperative with the jail staff.

{¶30} The Ashtabula County Grand Jury indicted Mr. Pineda on the following three counts: obstructing official business, a felony of the fifth degree, in violation of R.C. 2921.31(A) and (B) (count 1); resisting arrest, a misdemeanor of the second degree, in violation of R.C. 2921.33(A) (count 2); and sexual imposition, a misdemeanor of the third degree, in violation of R.C. 2907.06(A)(1) (count 3).

{¶31} Mr. Pineda pleaded not guilty to the charges, and the matter proceeded to a jury trial.

{¶32} At trial, the state elicited testimony from Ms. Cowell and Deputy Daniels and presented photographs of the residence.

{¶33} Following the state's presentation of its evidence, the defense moved for acquittal pursuant Crim.R. 29. The trial court granted Mr. Pineda's motion with respect to obstructing official business (count 1) and resisting arrest (count 2) and overruled it with respect to sexual imposition (count 3).

{¶34} Mr. Pineda testified in his own defense, and the defense rested.

6

{¶35} The defense renewed its Crim.R. 29 motion for acquittal with respect to the sole remaining count, sexual imposition (count 3). The defense argued that the state failed to present evidence other than Ms. Cowell's testimony to support Mr. Pineda's conviction, as required by R.C. 2907.06(B).

{¶36} The trial court researched the issue and overruled the motion. The court determined that the state presented sufficient "other evidence" pursuant to the statute, consisting of Ms. Cowell's texting of the incident to Ms. Fink, Ms. Fink's notification of the sheriff's department, and the sheriff's dispatch to the residence.

{¶37} Following deliberations, the jury found Mr. Pineda guilty of sexual imposition (count 3). The trial court deferred sentencing until after the jury trial scheduled in case no. 18 CR 00733.

### Case No. 18 CR 00733

{¶38} In case no. 18 CR 00733, Mr. Pineda was convicted of domestic violence and obstructing official business after allegedly attacking his wife, Ms. Fink, a few weeks later.

{¶39} According to Ms. Fink, on November 2, 2018, she arrived home after work at approximately 5:15 p.m. and found Mr. Pineda hunched over the kitchen table. She said, "you're drunk again," to which Mr. Pineda replied, "yeah." Mr. Pineda's drinking problem had been an issue in the couple's marriage.

{¶40} Ms. Fink went to the living room to take the dogs out, and Mr. Pineda followed her. The next thing she knew, she was on the living room floor while Mr. Pineda was choking and strangling her from behind. She was then on her back with Mr. Pineda on top of her, choking her with both hands. Mr. Pineda said "you're going to die now.

7

Bitch, die. You are going to f**king die." The choking lasted for 20 to 25 minutes to the point that Ms. Fink heard "cracking" in her neck and blacked out a few times.

{¶41} Mr. Pineda tore off Ms. Fink's clothes, stretching out her tank top and breaking the zipper of her pants. He also pulled out a clump of her hair. Ms. Fink told Mr. Pineda that she needed to urinate, and he made her do so on the living room floor. He then inserted his fingers inside Ms. Fink's vagina and made her lick them.

{¶42} Ms. Fink attempted to call for help by saying, "Google, dial 9-1-1" to the phone located in the pocket of her jacket, but she was not successful.

{¶43} Ms. Fink eventually got up and went into the bathroom and into the kitchen, where she sat down, drank a Coke, and smoked a cigarette. Mr. Pineda, who had followed her, told her to go upstairs.

{¶44} While upstairs, Mr. Pineda told Ms. Fink that he could rape her again and forced her to have vaginal intercourse. Mr. Pineda "finally passed out," and Ms. Fink told him that she was going to take the dogs out. She dressed in "sweats" and "a hoodie," went downstairs, grabbed her cell phone, and took her dogs out.

{¶45} While outside, she called her cousin, Ms. Cowell, because she "needed to hear a familiar voice." She told Ms. Cowell that Mr. Pineda had attacked her. Ms. Cowell called 911. Ms. Fink also called her cousin, Tim Fink, and asked him to stay on the line with her in case Mr. Pineda came downstairs.

{¶46} Deputies Evans and Sterrick from the Ashtabula County Sheriff's Department responded to the scene, as did their supervisor, Sergeant Rose.

{¶47} Deputy Sterrick arrived first. Ms. Fink came running down the driveway to his patrol car, asking for his help. She told Deputy Sterrick what had occurred, and he

8

observed red marks and irritation on her neck that was consistent with her allegations of domestic violence. Ms. Fink indicated she wanted to pursue domestic violence charges against Mr. Pineda and gave the deputies permission to enter the house and arrest him. She reported that Mr. Pineda was last seen in the upstairs bedroom, where he was intoxicated and passed out on the bed.

{¶48} The deputies found Mr. Pineda lying on his back on the bed, passed out and naked. According to Deputy Evans, Mr. Pineda was intoxicated, as there was an odor of alcohol and numerous open containers in the bedroom.

{¶49} The deputies attempted to take Mr. Pineda into custody without waking him. Deputy Evans placed a handcuff on Mr. Pineda's left arm but could not complete handcuffing him while he was lying on his back. At that point, the deputies woke up Mr. Pineda, identified themselves, and advised him that he was under arrest. They instructed Mr. Pineda to roll over onto his stomach and put his other hand behind his back. Mr. Pineda responded by pulling away and fighting while reaching underneath the blankets and pillows on the side of the bed.

{¶50} Deputy Sterrick advised Mr. Pineda that if he did not comply and put his hands behind his back, he would be tased. Mr. Pineda did not comply and said he did nothing wrong. Deputy Evans unsuccessfully tried to roll Mr. Pineda over, and Deputy Sterrick eventually tased him three separate times. Mr. Pineda continued fighting until the third tasing, at which time Deputy Evans was able to put both of Mr. Pineda's arms into handcuffs.

{¶51} After being handcuffed, Mr. Pineda would not stand up. Eventually, the deputies were able to get him up, put a pair of pants on him, and walk him down the

stairs. Sergeant Rose entered the residence to check on the deputies because of the delay in completing Mr. Pineda's arrest. As the deputies walked Mr. Pineda down the stairs, he threw himself into the wall and yelled down to Sergeant Rose, "look what they did to me, look what they did to me." Sergeant Rose responded that he saw Mr. Pineda "smack [his] own head off the wall."

{¶52} Deputy Sterrick took photos of Mr. Pineda's back where the taser darts had made contact, and Sergeant Rose took him to jail.

{¶53} Deputy Sterrick took photos of Ms. Fink's injuries, which included redness and irritation to her neck and a missing clump of hair on the side of her head. He also took photos of the scene, which included a clump of hair and a pair of black pants on the floor and wet soiling on the carpet.

{¶54} Ms. Fink declined medical treatment immediately following the incident but went to the hospital a few days later.

{¶55} Lt. Cumberledge subsequently interviewed Mr. Pineda. He advised Mr. Pineda of his *Miranda* rights, which he waived.

{¶56} Mr. Pineda began by asking whether his wife was okay. Mr. Pineda then told Lt. Cumberledge that on the day of the incident, he had gotten off work that morning after working third shift and stopped to purchase a 12-pack of beer. When he arrived home, he consumed the 12-pack, at which point he was intoxicated and went upstairs to bed.

{¶57} He remembered Ms. Fink waking him up in bed at about 6 p.m. He thought he was having a bad dream, and he began choking her and saying "pretty mean things." Ms. Fink said, "Chris, you're hurting me," and yelled for Google to call the sheriff's

10

department. He let go of her and went back to sleep. The next thing he remembered was being woken up by the police and "getting the living sh\*t beat out of" him.

{¶58} When confronted with the allegations that he raped Ms. Fink, Mr. Pineda said that he hoped they were not true. He remarked that he did not see himself doing that to his wife but acknowledged "maybe it did happen" and that he may have "blacked out." He further remarked, "If I am in trouble and I did do it, I want to face the consequences and get on with my life."

{¶59} Following the interview, Lt. Cumberledge obtained a DNA sample from Mr. Pineda. On the same day, Lt. Cumberledge interviewed Ms. Fink, who was accompanied by Ms. Cowell.

{¶60} The Ashtabula County Grand Jury indicted Mr. Pineda on the following six counts: two counts of rape, felonies of the first degree, in violation of R.C. 2907.02(A)(2) (counts 1 and 2); kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(4) and (C)(1) (count 3); obstructing official business, a felony of the fifth degree, in violation of R.C. 2921.31(A) and (B) (count 4); domestic violence, a misdemeanor of the first degree, in violation of R.C. 2919.25(A) (count 5); and resisting arrest, a misdemeanor of the second degree, in violation of R.C. 2921.33(A) (count 6).

{¶61} Mr. Pineda pleaded not guilty to the charges, and the matter proceeded to a jury trial.

{¶62} The state presented testimony from Ms. Fink, the investigating officers, and photos of Ms. Fink and the scene. Upon the defense's request, the video recordings of Lt. Cumberledge's separate interviews with Mr. Pineda and Ms. Fink were played for the jury.

11

{¶63} Following the state's presentation of evidence, the defense moved for acquittal pursuant Crim.R. 29, which the trial court overruled.

{¶64} The defense presented testimony from Ms. Cowell and from Deputy Daniels, who responded to the alleged incident in case no. 18 CR 00668. Mr. Pineda did not testify.

{¶65} After resting, the defense renewed its Crim.R. 29 motion, which the trial court overruled.

{¶66} The parties stipulated that no DNA evidence foreign to Ms. Fink was found on any of the samples submitted to the Ohio Bureau of Criminal Investigation.

{¶67} Following deliberations, the jury found Mr. Pineda not guilty of the two rape offenses (counts 1 and 2), kidnapping (count 3), and resisting arrest (count 6), and found him guilty of obstructing official business (count 4) and domestic violence (count 5).

{¶68} The trial court ordered a presentence investigation and set the matter for sentencing to be held at the same time as sentencing in case no. 18 CR 00668.

### *Sentencing*

{¶69} The trial court subsequently held a sentencing hearing relating to both cases. In case no. 2018 CR 00733, trial court sentenced Mr. Pineda to a prison term of 12 months for obstructing official business (count 4) and a jail term of six months for domestic violence (count 5), with the jail term to be served concurrent to the prison term.

{¶70} In case no. 2018 CR 00668, the trial court sentenced Mr. Pineda to a jail term of 60 days for sexual imposition (count 3) to be served concurrent to the sentence imposed in case no. 2018 CR 00733 and classified him as a Tier I Sex Offender.

{¶71} The trial court subsequently issued judgment entries memorializing the jury's guilty verdicts and Mr. Pineda's sentences.

{¶72} Mr. Pineda appealed both judgment entries, and we consolidated his appeals, sua sponte. He now presents the following two assignments of error for our review:

{¶73} "[1.] Pineda's conviction [sic] was based on insufficient evidence as a matter of law and the trial court erred by denying Pineda's Rule 29 motion.

{¶74} "[2.] Pineda'[s] convictions were against the manifest weight of the evidence in violation of the due process clause of the Constitution (Clause XIV, Section 1, United States Constitution)."

## Sufficiency of the Evidence

{¶75} In his first assignment of error, Mr. Pineda contends that his convictions were based on insufficient evidence as a matter of law and that the trial court erred by denying his Crim.R. 29 motions for acquittal.

### Standard of Review

{¶76} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, when a defendant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state. *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 & 2003-T-0167, 2004-Ohio-6688, ¶ 18.

13

{¶77} ""'[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶78} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at 259-260.

{¶79} When evaluating the adequacy of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 386-387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offenses and a review of the state's evidence. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

{¶80} Mr. Pineda challenges the sufficiency of the evidence for all three of his convictions.

### *Sexual Imposition*

{¶81} Mr. Pineda was convicted of sexual imposition in violation of R.C. 2907.06(A)(1), which provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person * * * or is reckless in that regard."

{¶82} As Mr. Pineda correctly notes, R.C. 2907.06(B) provides that "[n]o person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence." The legislative service commission wrote in 1973 that "[s]ince the offense is of a type which may be particularly susceptible to abuse in prosecution, the section specifically provides that there can be no conviction based solely on the uncorroborated testimony of the victim."

{¶83} Mr. Pineda contends that the state failed to present corroborating evidence as required by R.C. 2907.06(B). We disagree.

{¶84} The Supreme Court of Ohio has held that "[t]he corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory." *State v. Economo*, 76 Ohio St.3d 56, 60, 666 N.E.2d 225 (1996).

{¶85} In addition to testifying regarding Mr. Pineda's alleged sexual contact, Ms. Cowell testified that she texted and talked on the phone with Ms. Fink. According to Ms. Cowell, Ms. Fink said she sounded "distant on the phone" and "like something was really bothering" her. Although she did not tell Ms. Fink at that time what Mr. Pineda had

15

allegedly done, Ms. Fink proceeded to call the sheriff's department, who responded to the scene.

{¶86} The state also presented testimony from Deputy Daniels. He testified that Ms. Fink called the sheriff's dispatch reporting that Mr. Pineda was "inappropriately touching the babysitter." He and Sergeant Allen responded to the scene. Based on his private conversation with Ms. Cowell, he determined that Mr. Pineda would be charged, and the deputies arrested Mr. Pineda.

{¶87} The foregoing constitutes, at the very least, "slight circumstances or evidence that tends to support" Ms. Cowell's testimony, pursuant to *Economo.* Thus, the state presented sufficient evidence, if believed, to find Mr. Pineda guilty of sexual imposition beyond a reasonable doubt.

### *Obstructing Official Business*

{¶88} Mr. Pineda was convicted of obstructing official business, a fifth-degree felony, in violation of R.C. 2921.31(A) and (B), which provide as follows:

{¶89} "(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

{¶90} "(B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree."

16

{¶91} "Law enforcement officers" are considered "public officials." R.C. 2921.01(A).

{¶92} Mr. Pineda contends that the state failed to present sufficient evidence to establish several elements of the offense of obstructing official business, which we consider in turn.

Affirmative Acts

{¶93} First, Mr. Pineda contends that the state failed to prove that he committed affirmative acts rather than merely failing or refusing to comply. Mr. Pineda cites this court's decision in *State v. Parkhurst*, 11th Dist. Trumbull No. 2015-T-0041, 2016-Ohio-1018, where we stated as follows:

{¶94} "'Ohio courts have consistently held that in order to violate the obstructing official business statute a defendant must engage in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's duties,' and '[a] mere failure or refusal to respond to an officer's request does not constitute obstructing official business.' (Citations omitted.) *State v. McLaughlin*, 2nd Dist. Montgomery No. 26521, 2015-Ohio-4611, ¶ 13. 'With respect to R.C. 2921.31(A), [this court has] previously held that "an individual cannot be found guilty of obstructing official business by doing nothing because the statute specifically requires an offender to act," citing to case law throughout Ohio.' *State v. Vitantonio*, 995 N.E.2d 1291, 2013-Ohio-4100, ¶ 13 (11th Dist.), citing *State v. Brown*, 11th Dist. Lake No. 2006-L-064, 2006-Ohio-6872, ¶ 29." *Id.* at ¶ 28.

{¶95} Here, the deputies testified that they woke up Mr. Pineda, identified themselves, and advised him that he was under arrest. They instructed him to roll over

onto his stomach and put his other hand behind his back. Mr. Pineda responded by pulling away and fighting while reaching underneath the blankets and pillows on the side of the bed. He continued fighting until the third tasing.

{¶96} Thus, the state presented sufficient evidence, if believed, to establish that Mr. Pineda engaged in affirmative acts.

<u>Purposely</u>

{¶97} Second, Mr. Pineda contends that the state failed to prove that he acted purposely.

{¶98} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶99} Mr. Pineda cites the Tenth District Court of Appeals' decision in *State v. Ivery*, 10th Dist. Franklin No. 06AP-32, 2007-Ohio-496. In that case, officers were conducting an inventory search of an unattended running vehicle that they decided to impound, when the appellant came out of her house and began yelling at them. *Id.* at ¶ 3. She approached the officers in an aggressive and angry manner with a pen in her hand, stating that she wanted badge numbers and an officer's name. *Id.* at ¶ 5. When the appellant failed to return to her house as the officers ordered, she was arrested and was subsequently convicted of obstructing official business. *Id.* at ¶ 3, 12.

{¶100} The Tenth District determined there was legally insufficient evidence that the appellant "acted in such a manner with the purpose to prevent, obstruct or delay the performance of an official duty." *Id.* at ¶ 15. Rather, the appellant was "seeking to identify

18

the officers, not necessarily to delay the officers in their official duties." *Id.* at ¶ 16. The court held that "[e]ven if appellant's conduct was improper or inappropriate and did obstruct the officers' performance of their duties, it does not constitute an offense under R.C. 2921.31 unless it was her purpose to hamper or impede official business." *Id.*

{¶101} Here, the deputies testified that while he was fighting with them, Mr. Pineda stated that he did nothing wrong. Thus, the state presented sufficient evidence, if believed, to establish that Mr. Pineda's affirmative acts were for the purpose of preventing, obstructing, or delaying his arrest.

<u>Hampered or Impeded</u>

{¶102} Third, Mr. Pineda contends that the state failed to prove his actions hampered or impeded the officers because the incident in his bedroom took only 35 seconds.

{¶103} In support, Mr. Pineda cites the Second District's decision in *State v. Crawford*, 2d Dist. Montgomery No. 25506, 2013-Ohio-4398. In *Crawford*, officers were executing a search warrant at a residence. *Id.* at ¶ 2-3. As they approached, the appellant came to the front door, yelled "Police," and slammed the door, but he did not lock it. *Id.* at ¶ 4. The officers then breached the front door using a battering ram and entered the residence. *Id.* The appellant was later convicted of obstructing official business. *Id.* at ¶ 5.

{¶104} The Second District found that there was legally insufficient evidence to support the appellant's conviction. *Id.* at ¶ 21. While the court determined that appellant's closing of the front door arguably constituted an "affirmative act," it "amounted to no more than a refusal to cooperate with the officers" in the execution of a search warrant, which

the court stated is insufficient as a matter of law to amount to obstructing official business. *Id.* at ¶ 18, 20.

{¶105} The court further determined that "[a]ny purported delay" caused the appellant's actions "was de minimus under the circumstances, and the police were clearly not hampered or impeded in any way from executing the search warrant." *Id.* at ¶ 20. "The very nature of the warrant permitted the police to use a ram to gain entry, they were equipped to do so, and [appellant] was not required to assist them." *Id.*

{¶106} We find *Crawford* to be factually distinguishable. As demonstrated above, Mr. Pineda's affirmative acts of fighting with the police to avoid arrest were not equivalent to a mere failure to cooperate in the execution of a search warrant. Courts have determined that a defendant's attempt to flee that leads to a brief scuffle or wrestling with police is sufficient to hamper or impede the officer's performance of his lawful duties. *State v. Gordon*, 2017-Ohio-7147, 95 N.E.3d 994, ¶ 22 (9th Dist.).

{¶107} In addition, Sergeant Rose, the deputies' supervisor, testified that he entered the residence to check on them because of the delay in completing Mr. Pineda's arrest. This supports an inference that Mr. Pineda's actions caused delay that was more than de minimis.

{¶108} Thus, the state presented sufficient evidence, if believed, to establish that Mr. Pineda's affirmative acts actually hampered or impeded his arrest.

<u>Risk of Physical Harm</u>

{¶109} Finally, Mr. Pineda contends that the state failed to prove that Mr. Pineda created a risk of physical harm to the officers, which was required for the state to elevate his offense to a fifth-degree felony pursuant to R.C. 2921.31(B).

20

{¶110} As indicated, R.C. 2921.31(B) provides that "[i]f a violation of this section creates *a risk of physical harm to any person*, obstructing official business is a felony of the fifth degree." (Emphasis added.) Therefore, the statute is satisfied when a defendant increases the risk of physical harm to any person, including himself. *State v. Gannon*, 9th Dist. Medina No. 19CA0053-M, 2020-Ohio-3075, ¶ 15; *see State v. Vargas*, 8th Dist. Cuyahoga No. 97377, 2012-Ohio-2768, ¶ 16 (statute satisfied where the defendant caused a risk of physical harm to himself).

{¶111} The term "physical harm to persons" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). The term "risk" means "a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(7).

{¶112} The deputies testified to several actions by Mr. Pineda that, if believed, were sufficient to establish that he created a risk of physical harm to the deputies and to himself.

{¶113} Courts have found that a risk of physical harm can exist when an officer attempts to restrain a suspect. *Gordon* at ¶ 22. The deputies testified that Mr. Pineda's actions included fighting with them to prevent his arrest, placing his hands where the deputies could not see them, and hitting his head against the wall while the deputies walked him down the stairs.

{¶114} In addition, the fact that a defendant's actions necessitated the use of a taser can also create a risk of physical harm to the officers. *See State v. Singh*, 9th Dist. Summit No. 28819, 2018-Ohio-3473, ¶ 14. The deputies testified that they were forced to tase Mr. Pineda three times before he would stop fighting and comply.

{¶115} Thus, the state presented sufficient evidence, if believed, to establish that Mr. Pineda's actions created a "risk of physical harm to any person" pursuant to R.C. 2921.31(B).

### Domestic Violence

{¶116} Mr. Pineda was convicted of domestic violence in violation of R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶117} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."  R.C. 2901.22(B).

{¶118} Mr. Pineda contends that the state failed to prove that he "knowingly" caused harm to Ms. Fink.  Although he admitted to choking Ms. Fink, he had been asleep after drinking 12 beers; he thought he was having a bad dream; and he stopped what he was doing when Ms. Fink told him he was hurting her.  He began his interview with Lt. Cumberledge by asking whether Ms. Fink was okay and showed concern for Ms. Fink during the investigation.

{¶119} Mr. Pineda's argument appears to relate to whether he acted "purposely," which is a separate and inapplicable mental state.  *See* R.C. 2901.22(A) ("A person acts purposely when it is the person's specific intention to cause a certain result * * *").  The abundant evidence that Mr. Pineda choked Ms. Fink is sufficient evidence to support a finding that he was aware that his conduct would probably cause a certain result pursuant to R.C. 2901.22(B).

22

{¶120} Whether Mr. Pineda was subjectively trying to hurt Ms. Fink was irrelevant to the mental state of knowingly. *See State v. Martin*, 5th Dist. Delaware No. 14 CAA 03 0016, 2015-Ohio-1106, ¶ 66. The fact that Mr. Pineda was intoxicated at the time was also irrelevant. *See* R.C. 2901.21(E) ("Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense").

{¶121} Thus, the evidence, if believed, was sufficient to establish that Mr. Pineda "knowingly" caused or attempted to cause Ms. Fink physical harm pursuant to R.C. 2919.25(A), even if it was not purposeful.

{¶122} In sum, the state presented sufficient evidence, if believed, to prove the offenses of sexual imposition, obstructing official business, and domestic violence beyond a reasonable doubt.

{¶123} Mr. Pineda's first assignment of error is without merit.

### Manifest Weight of the Evidence

{¶124} In his second assignment of error, Mr. Pineda contends that his convictions were against the manifest weight of the evidence.

### *Standard of Review*

{¶125} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, *supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶126} "'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.'" *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

### Sexual Imposition

{¶127} Mr. Pineda contends that his conviction for sexual imposition was against the manifest weight of the evidence because Ms. Cowell was not a credible witness. Specifically, Mr. Pineda points to inconsistencies between the information Ms. Cowell conveyed to Ms. Fink by phone and Ms. Fink's subsequent call to the sheriff's department. He also contends that Ms. Cowell's testimony was contradictory, as she stated that Mr. Pineda would not leave her side but also that he was "bouncing" from room to room.

{¶128} As we have previously acknowledged, this court is not in a position to view the witnesses who testified below, observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony. *State v. Thompson*, 2016-Ohio-7154, 71 N.E.3d 1219, ¶ 7 (11th Dist.). Therefore, in weighing the evidence submitted at a criminal trial, an appellate court must give substantial deference to the factfinder's determinations of credibility. *Id.*; *see State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus

("On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts"). Further, the trier of facts is free to believe all, part, or none of the testimony of each witness appearing before it. *State v. Masters*, 11th Dist. Lake No. 2019-L-037, 2020-Ohio-864, ¶ 19.

{¶129} Although we recognize that Ms. Cowell's testimony was inconsistent at times, the jury was in the best position to view her and evaluate her credibility. The jury apparently chose to believe her version of events over Mr. Pineda, who, according to both Ms. Cowell and Deputy Daniels, was intoxicated on the day of the incident.

{¶130} Taken as a whole, the inconsistencies in Ms. Cowell's version of the events do not render her testimony completely incredible. Accordingly, we conclude that the jury did not clearly lose its way or create a manifest miscarriage of justice by finding Mr. Pineda guilty of sexual imposition.

### *Domestic Violence*

{¶131} Mr. Pineda also contends that his conviction for domestic violence was against the manifest weight of the evidence because Ms. Fink was not a credible witness.

{¶132} It appears that the jury found Ms. Fink's testimony less than credible in part, since it found Mr. Pineda not guilty of the two rape offenses and kidnapping. However, Ms. Fink's testimony regarding domestic violence is supported by other evidence, including Mr. Pineda's admission, law enforcement testimony, and photos documenting physical injuries to her neck and head. Accordingly, we conclude that the jury did not clearly lose its way or create a manifest miscarriage of justice by finding Mr. Pineda guilty of domestic violence.

### *Obstructing Official Business*

{¶133} Although Mr. Pineda asserts in his second assignment of error that his "convictions" were against the manifest weight of the evidence, he has not set forth an argument regarding his conviction for obstructing official business. *See* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies"); *State v. Herron*, 11th Dist. Lake Nos. 2009-L-119, et al., 2010-Ohio-2050, ¶ 16 ("An appellant bears the burden of affirmatively demonstrating error on appeal"). Therefore, Mr. Pineda has not demonstrated that his conviction for obstructing official business was against the manifest weight of the evidence.

{¶134} In sum, Mr. Pineda's convictions for sexual imposition, domestic violence, and obstructing official business were not against the manifest weight of the evidence.

{¶135} Mr. Pineda's second assignment of error is without merit.

{¶136} For the foregoing reasons, the judgments of the Ashtabula County Court of Common Pleas are affirmed.

CYNTHIA WESCOTT RICE, J.,

MATT LYNCH, J.,

concur.