[Cite as *State v. Page*, 2017-Ohio-568.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26670 |
| | : | |
| v. | : | T.C. NO. 13CR2551 |
| | : | |
| WESLEY T. PAGE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____17th____ day of _____February_____, 2017.

. . . . . . . . . .

LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 W. Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Wesley Thomas Page was convicted by a jury in the Montgomery County Court of Common Pleas of two counts of rape (child under the age of 13) and two counts of gross sexual imposition (child under the age of 13). He was sentenced to an

aggregate term of imprisonment of ten years to life.    Page appeals from his conviction.

{¶ 2}   For the following reasons, the judgment of the trial court will be affirmed.

## I. Background

{¶ 3}   The victim, A., was eight or nine years old at the time of the alleged offenses, which occurred between May 2011 and May 2013.    Page was A.'s maternal uncle and occasional babysitter.   The specific allegations against Page will be discussed in detail under the first assignment of error.

{¶ 4}   On November 7, 2013, Page was indicted on two counts of rape of a child under the age of 13 and two counts of gross sexual imposition of a child under the age of 13.   He was tried by a jury and found guilty on all counts.   He was sentenced to ten years to life on each count of rape and to 60 months on each count of gross sexual imposition, to be served concurrently.   He was also designated to be a Tier III sex offender for the rapes and a Tier II sex offender for the gross sexual impositions.

{¶ 5}   Page raises three assignments of error on appeal.

## II. Sufficiency and Weight of the Evidence

{¶ 6} In his first assignment of error, Page asserts that the trial court erred in denying his Crim.R. 29 motion for acquittal, that there was insufficient evidence to support his conviction, and that his conviction was against the manifest weight of the evidence. He asserts that "the victim's testimony was peppered with inconsistencies," that no medical or DNA evidence corroborated the victim's claims, and that the victim's testimony should not have been credited.

{¶ 7}   "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to

the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An appellate court applies the same standard when reviewing the denial of a Crim.R. 29(A) motion as is used to review a sufficiency of the evidence claim. *State v. Sheppeard,* 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 51.

{¶ 8} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 9} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 21. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 10} As is relevant to this case, rape is defined as follows: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when

[t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). Sexual conduct "means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. * * * " R.C. 2907.01(A). Gross sexual imposition occurs when one has sexual contact with another, not the spouse of the offender, or causes another, not the spouse of the offender, to have sexual contact with the offender, where the other person is less than 13 year of age, regardless of whether the offender knows the other's age. R.C. 2907.05(A)(4). Sexual contact is defined as the "touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 11} The State's evidence at trial was as follows:

{¶ 12} A. was age 13 at the time of the trial. She testified that, when she was 8 or 9 years old and her mother would go to work, there were several people who would watch her, including her grandmother and "Uncle Tommy" (Page).

{¶ 13} The victim testified that Uncle Tommy had lived at different houses, and the first time Uncle Tommy touched her was when she was at his house with the swimming pool. She and her younger brother wanted to go swimming in the backyard pool, but Uncle Tommy said they could not swim "until * * * I do something." He then led her to his bedroom, closed the door, and told her to get undressed.

{¶ 14} A. went into the bathroom off of Uncle Tommy's bedroom and took off her

swimsuit.   Uncle Tommy told her to come out and, when she did, his "private" was out. She identified his "private" on a doll, pointing to the genitals.   A. stated that Uncle Tommy's "private" was "kind of both" hard and soft and "kind of up in, like, diagonal." Tommy told A. to get on his bed and to put her mouth on his "private" and "keep it there until he says."   She complied and put her mouth "right on his top of his private" for a few minutes, during which the victim was watching a clock.   The victim stated that she did not like doing this, that it made her uncomfortable, and that she had never previously seen an adult male "private."   According to A., nothing came out of Tommy's private on this occasion when she put her mouth on it.

{¶ 15}   When Tommy took his "private" out of A.'s mouth, he then put his mouth on her "privates," which she again identified on a doll.   She testified that it was not a "quick kiss"; he kept his mouth there, and she did not like it.

{¶ 16}   When Uncle Tommy was finished, A. was allowed to put her swimsuit back on and go swimming.   Tommy made A. promise not to tell anyone and said she would get in trouble if she told.   She "pinky promised" and they interlocked their "pinky" fingers. According to A., her younger brother and possibly one other child were present at the house when these events occurred, but no other adults were present.   She testified that she cried while she was swimming, but her brother did not notice because she was wet.

{¶ 17}   A. also testified about a second incident of touching by Uncle Tommy, which happened at the same house.   On that occasion, Uncle Tommy's wife and A.'s brother went shopping, leaving A. at home with Uncle Tommy.   Uncle Tommy asked, "Do you want to do what we did again?," and A. answered, "No."   Uncle Tommy said, "Come on. You liked that."   While she was in the living room watching television, Uncle

Tommy instructed A. to take her clothes off. A. complied with taking her clothes off, although she did not want to do so, and she saw his "private" again. She put Uncle Tommy's "private" in her mouth and "just kept it still" while Tommy moved her hair. "Liquid stuff" came out of Tommy's penis, which she could taste and feel but could not see; she described this as "gross" and "nasty," and she spit it out. Uncle Tommy then put his mouth on A.'s "private," near the area where "pee" comes out. Uncle Tommy stopped when he heard his wife pull up, then told A., "Quick, run to the bathroom. Get your clothes on."

{¶ 18} A. could not identify specific days when these two events happened, but she estimated that they were about a month apart, and she stated that the weather was warm on both occasions. She believed she was eight or nine years old at the time. Other witnesses testified about the characteristics of various houses in which Page had lived (i.e., a swimming pool and a bedroom with a private bathroom), and approximately when he lived in each.

{¶ 19} A. testified that, on a third occasion, about two years after the first two incidents, much of the family was at her house and she was playing in her room. Uncle Tommy entered her room and touched her "up on [her] thigh really high." When A.'s mother (Mother) walked by the room, Tommy "stopped tickling [her] down by [her] thighs and started going up on [her] stomach." A. did not see his "private" on this occasion, and he did not touch "inside of [her] private area." About 10 minutes later, the victim told Mother that she (A.) was upset because Uncle Tommy had touched her. After a short conversation, A. and Mother decided to go ahead with the family hike, but they agreed that A. would stay close to Mother while they were there.

{¶ 20} Mother, who is also Page's sister, testified that she had been very close to her brother, that she had thought he also had a very good relationship with A., and that she had trusted Page to watch her children. Page regularly babysat Mother's children while she worked and also sometimes on Saturday nights when Mother went out with Page's wife, with whom Mother was also very close.

{¶ 21} Mother testified that, on Memorial Day weekend 2013, she was hosting a cook-out for her family, after which they planned to go for a hike. At the house, Mother observed Page in A.'s bedroom tickling her, at which time Mother told A. to go outside. A short time later, after A. resisted going on the hike with the extended family, Mother said that A. told her (Mother) that Page had touched her (A.). (A. had directly testified similarly.) Mother testified that A. was "shaky," "nervous," and "teary-eyed" when talking about it and stated that she had been afraid to tell Mother sooner. Mother and A. agreed to go on the hike, because the rest of the family had already departed and was wondering where they were, but they did not say anything about the abuse during this outing, and A. stayed close to Mother. Mother, who was unsure how to handle the situation, scheduled an appointment for Tuesday with a psychologist who had previously treated A. for attention deficit hyperactivity disorder (ADHD) and other issues.

{¶ 22} Marisa Borgert, Ph.D., a clinical psychologist who worked with A. before and after the disclosure of sexual abuse, testified that her first discussion with A. about the alleged sexual abuse occurred on May 28, 2013, when Mother brought A. to an appointment made for that purpose. At this appointment, the victim wrote down an account of what had happened, because she was uncomfortable talking about it. Borgert testified that A. had been more quiet than usual, "very serious," and "reserved" during this

visit, whereas she was usually "pretty happy," "upbeat," and "very talkative." Borgert testified that her purpose was not to gather details about the abuse but to talk with the victim about her feelings.

{¶ 23} Dr. Brenda Joyce Miceli, a psychologist at Dayton Children's Hospital's Care House who does evaluations and therapy with children who have disclosed abuse or trauma, also testified for the State. She had not treated or evaluated the victim in this case, but she testified to the general characteristics and common behaviors of children who have been abused, including reasons for delayed disclosure, fear, secrecy, and the ability to describe physical characteristics or behaviors the child otherwise would not have experienced.

{¶ 24} Page's daughter, age 19, also testified for the State. She testified that she had never lived with her father, but she had visited with him between 2010 and 2013, including the summers of 2011 and 2012, and that the victim and her brother were "constantly over" at Page's house.

{¶ 25} Finally, investigating Detective Mike Rotterman testified about receiving a report regarding A. from Children Services. Rotterman primarily handled child abuse and sex abuse cases. During the course of his investigation, Rotterman was informed by Mother that Page had moved to Florida, where Mother's and Page's mother (the victim's grandmother) lived. Rotterman talked with Page's mother and his wife, after which he received a call from Page in July 2013. Page asserted that he was travelling and then in Detroit with his job as a "storm chaser" (assisting power companies with repairs in an area with significant storm damage). According to Page, his wife had gone to Florida and was staying with Page's mother, but their plans for a move to Florida were

uncertain.

**{¶ 26}** With respect to the police investigation, Rotterman testified that Page denied ever being alone with the victim and claimed he did not like the victim or her brother, to whom he referred as "brats." Page offered to come back to Ohio to assist with the investigation, but he did not do so until police "had him brought back." Rotterman stated that no DNA or other scientific evidence was collected in the case because of the significant time that elapsed between the alleged incidents and the victim's disclosure of the abuse.

**{¶ 27}** Rotterman was questioned about what he had learned about the reasons for Page's move to Florida, which generally coincided with the beginning of the police investigation in this case. Rotterman stated that it was possible that Page had moved to Florida for work; his work as a storm chaser had been "sporadic." However, Page's work at a motorcycle shop owned by his grandfather in Florida after the move had not been full-time, his coming and asking for a job at the motorcycle shop was a "surprise" to the manager, and he was paid "under the table."

**{¶ 28}** Page's wife and a long-time friend testified for the defense. His wife testified that Page had not enjoyed babysitting his sister's children, had not been paid for doing so, and had never been alone with the children because the wife's daughter or someone else had always been present. Page's wife testified that when she had socialized with Mother, Mother's husband had watched the children. She testified that Page had "steady work" at the motorcycle shop in Florida and that she also helped out at the shop but did not get paid. According to Page's wife, he got paid every week, but not by check; "if there was money, they gave it to him."

{¶ 29} Page's friend testified that Page was like a brother to him, that he had often seen the victim and her brother at Page's house, and that both Page and his wife cared for the children. The friend also testified that Page's work as a storm chaser while living in Ohio had been sporadic.

{¶ 30} Although Page argues in his brief that the jury should not have credited the victim's testimony, the believability of the evidence was for the jury to determine. A.'s testimony, if believed, was sufficient to support Page's conviction of both rape and gross sexual imposition. Thus, the trial court did not err in denying his Crim.R. 29 motion for acquittal, and his conviction was supported by sufficient evidence.

{¶ 31} The victim recounted two distinct instances of sexual abuse, at distinct locations within Page's house, which, if believed, constituted rape and gross sexual imposition. She also described details of a sexual encounter that a child would be unlikely to know but for having experienced such abuse. This testimony was not inherently lacking in credibility or fraught with inconsistencies, as Page suggests. Moreover, under the circumstances presented, the jury could have reasonably rejected any suggestion that the absence of testing for DNA evidence cast reasonable doubt on the victim's testimony or the police investigation.[1] The jury did not clearly lose its way or create a manifest miscarriage of justice in finding Page guilty of the offenses, and his convictions were not against the manifest weight of the evidence.

{¶ 32} The first assignment of error is overruled.

---

[1] Even assuming that there was no corroborating evidence, which we do not find to be the case, corroborating evidence is not required in rape cases. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53.

### III. Hearsay Evidence

**{¶ 33}** In his second assignment of error, Page argues that the trial court erred in allowing hearsay evidence about a conversation between A. and her mother, because there was no evidence that the excited utterance exception or any other exception to the hearsay rule applied. Page asserts that the State attempted "to corroborate the only evidence it had" (the victim's testimony) with the testimony of her mother and "to play to the compassion of the jury."

**{¶ 34}** Page cites two portions of testimony in support of this argument. First, he cites a portion of the victim's testimony about disclosing the abuse to her mother.

Q. [Prosecutor]: *** Okay. And you just talked about Uncle Tommy touching your thigh. How long after Uncle Tommy touched your thigh do you think you told your mom?

A. [A.] Maybe like 10 minutes after.

Q. Okay. So it was pretty soon?

A. Yeah.

Q. Okay. And why did you tell your mom?

A. Because like she said, we were going to go on a, like, wicked hill, grand hill or something. They were going to, like, go on a trip and I didn't want to go and she kept asking why. And so, like, she got mad at me and went in the room and then I told her why and she didn't -- like, she was shocked at first and I told her I didn't want to go --

[Defense Counsel]: Objection.

A. -- because I didn't want that to happen.

{¶ 35} In a discussion at sidebar, defense counsel stated that his objection was based on "relaying to the jury [an] out-of-court statement by her mother." The State objected to this characterization of the testimony, stating that the witness was relaying the nature of her mother's reaction as she observed it, not any statement made by her mother. The State also assured the court that it did not intend to inquire into any statements Mother had made. The court agreed with the State that the victim's testimony in this instance was not hearsay, because it did not recount anything Mother had said.

{¶ 36} Second, Page argues that the trial court erred in admitting a portion of Mother's testimony which also related to the victim's disclosure of abuse. Mother recounted how the family was planning to go together to Charleston Falls for hiking, picnicking, and picture-taking. As she was getting her kids ready, and after others had already left for the hike, A. kept saying that she did not want to go, which was out of character for her. Defense counsel objected, arguing that the State was "trying to get it to the jury as a second way * * * for them to hear it [about the disclosure] a second time." However, the trial court found that the statements were offered for a non-hearsay purpose, and not for the truth of the matter asserted, i.e., to explain Mother's subsequent actions in encouraging A. to stay by her at the hike and in scheduling an appointment the next business day with A.'s doctor. Page's objection was overruled. Mother was then allowed to testify that, when she (Mother) asked why A. did not want to go, A. stated she did not want to go because "Tommy" would be there and he had touched her "down there," indicating her "privates."

{¶ 37} The admission or exclusion of evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Sage,* 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 130.

{¶ 38} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The trial court concluded that A.'s testimony about how her mother reacted to her disclosure did not constitute hearsay, because it did not relate any statement Mother had made. The trial court also concluded that Mother's testimony about A.'s disclosure of the abuse was offered primarily to explain how events unfolded and what Mother did in response, rather than to bolster A.'s credibility. Moreover, A. testified similarly and was subject to cross-examination. Although the foundation for the evidence as to how Mother reacted to whatever A. said could have been presented in a more conclusory fashion, we find no abuse of discretion in the trial court's handling of these matters.

{¶ 39} The second assignment of error is overruled

### IV. Evidence of Flight

{¶ 40} In his third assignment of error, Page argues that he was prejudiced by evidence that he moved to Florida around the time the victim disclosed the abuse, that the jury was allowed to infer that he knew of the allegations when he left Ohio, that the probative value of this evidence was outweighed by its unfair prejudice to him, and that no evidence was presented that he knew of the victim's allegations when he left for

Florida.

{¶ 41} At trial, Page objected on hearsay grounds to the testimony about his knowledge of A.'s allegations prior to his move to Florida, i.e., that his mother's (A.'s grandmother's) statements about the allegations, testified to by Page's wife, were hearsay. The trial court rejected this assertion, finding that the statements were not offered for the truth of the matter asserted. Page also raised the issue of spousal privilege, to preclude any testimony about conversations he and his wife may have had about the disclosures, and the trial court heard testimony, in camera, about whether any third party had been present during such conversations. The court concluded that spousal privilege applied.

{¶ 42} Page did not object at trial on the basis that testimony about his move to Florida was irrelevant or unduly prejudicial to him, as he does on appeal. Accordingly, we review for plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris,* 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *Singleton,* 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 43} Page's wife testified that she learned of A.'s allegations against her husband from her mother-in-law (A.'s grandmother) before she and Page moved to Florida in June 2013. Page's wife also testified that Page did not have a job in Florida when they moved there. Mother testified that she had told her mother (who was also

Page's mother) about the allegations by telephone the day of A.'s disclosure and the family hike on Memorial Day weekend, and that Mother had been angry at the end of this conversation. The jury could have reasonably inferred from this evidence that Page also knew of the allegations before he moved to Florida.

{¶ 44} The trial court did not abuse its discretion, much less commit plain error, in concluding that Page's decision to move to Florida around the time of A.'s disclosure and his motive(s) for doing so were relevant to this case. As such, it was not an "obvious defect" in the proceedings for the trial court to permit this testimony, and there is no basis to conclude that this evidence created a "manifest miscarriage of justice." Moreover, notwithstanding the representations of both parties that no cautionary instruction was requested or given to the jury on drawing inferences from Page's alleged "flight" from Ohio, the record establishes that the trial court did instruct the jury, without objection, on consciousness of guilt, in accordance with 2 Ohio Jury Instructions 409.13.[2]

{¶ 45} We find no basis to conclude that the trial court erred in admitting testimony about Page's move to Florida or that Page was unduly prejudiced by it.

{¶ 46} The third assignment of error is overruled.

### V. Conclusion

{¶ 47} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

HALL, P.J., and WELBAUM, J., concur.

---

[2] The instruction states, in part: "If you [the jury] find that the facts do not support that the defendant [fled], or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose."

Copies mailed to:

Lynne R. Nothstine
Lucas W. Wilder
Hon. Dennis J. Langer