[Cite as *State v. Morrow*, 2023-Ohio-2891.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | |
|---|---|
| STATE OF OHIO : | |
| : | |
| Appellee : | C.A. No. 2023-CA-6 |
| : | |
| v. : | Trial Court Case No. 2022 CR 149 |
| : | |
| JACOB ANDREW MORROW : | (Criminal Appeal from Common Pleas |
| : | Court) |
| Appellant : | |
| : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on August 18, 2023

· · · · · · · · · · ·

JEFFREY R. MCQUISTON, Attorney for Appellant

SAMANTHA B. WHETHERHOLT, Attorney for Appellee

· · · · · · · · · · · · ·

HUFFMAN, J.

{¶ 1} Jacob Andrew Morrow appeals from his conviction, following a jury trial, on one count of obstructing official business, a felony of the fifth degree. Specifically, he asserts that the jury's finding that he had created a risk of harm to himself or others while obstructing official business, which elevated the degree of the offense, was supported by insufficient evidence and was against the manifest weight of the evidence. For the following reasons, the judgment of the trial court is affirmed.

## PROCEDURAL HISTORY

{¶ 2} On August 1, 2022, Morrow was indicted on two counts of harassment with a bodily substance and one count of obstructing official business. The indictment alleged that Morrow had created a risk of physical harm to himself and to Tri-County Regional Jail corrections officers, including Ryan Bell, Tyler Cantrell, and Kevin Stroble, while obstructing official business. Specifically, while being held in a booking cell at the jail, Morrow had created a lengthy disturbance that resulted in his being pepper sprayed and placed in a restraining chair. Morrow pled not guilty on August 11, 2022.

{¶ 3} On January 17, 2023, the parties stipulated that Joint Exhibit 1 was a surveillance video from the Tri-County Regional Jail from July 1, 2022. They further stipulated that Morrow had been aware in 2017, 2018, 2019, 2020, and 2022 that he was a carrier of hepatitis C, and that he admitted to being a carrier.

{¶ 4} Morrow was tried by a jury in January 2023. At the close of the State's case, Morrow moved for a judgment of acquittal, which the trial court denied. Morrow then presented his defense. The jury found Morrow guilty of obstructing official business but not guilty of the two counts of harassment with a bodily substance. After a presentence investigation, Morrow was sentenced to 11 months in prison.

## ASSIGNMENTS OF ERROR AND ANALYSIS

{¶ 5} Morrow asserts two assignments of error which allege that the jury's finding that his conduct "create[d] a risk of physical harm to any person" was not supported by sufficient evidence and was against the manifest weight of the evidence. Pursuant to R.C. 2921.31(B), this finding elevated the degree of the offense of obstructing official

business from a misdemeanor of the second degree to a felony of the fifth degree.

{¶ 6} Although the State does not raise the issue, we note that Morrow did not renew his Crim.R. 29 motion for acquittal at the close of all the evidence at trial. Accordingly, he failed to preserve his sufficiency argument for appeal. *State v. Richardson*, 2016-Ohio-8081, 75 N.E.3d 831, ¶ 16 (2d Dist.) ("It is generally accepted in Ohio that if counsel fails to make *and* renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal."). But even if Morrow had renewed his Crim.R. 29 motion, his argument that his conviction for obstructing official business was based on insufficient evidence lacks merit.

{¶ 7} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*; *State v. Troche*, 3d Dist. Marion No. 9-22-18, 2023-Ohio-565, ¶ 18.

{¶ 8} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a

finding of sufficiency.' (Citations omitted.)" *State v. Curtis,* 2020-Ohio-4152, 157 N.E.3d 879, ¶ 44 (2d Dist.), quoting *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. Accordingly, " 'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.,* quoting *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 9} "* * * [A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also Curtis* at ¶ 19.

{¶ 10} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial

deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 1997-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 11} R.C. 2921.31(A) provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(B) states that obstructing official business is generally a misdemeanor of the second degree, but if the offense "creates a risk of physical harm to *any person*, obstructing official business is a felony of the fifth degree." (Emphasis added). " 'Physical harm to persons' means any injury, illness, or other psychological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 12} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "R.C. 2921.31(A) thus includes five essential elements: (1) an act by the defendant, (2) done

with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege." (Citations omitted.) *State v. Kates,* 169 Ohio App.3d 766, 2006-Ohio-6779, 865 N.E.2d 66, ¶ 21 (10th Dist.).

{¶ 13} This Court discussed obstructing official business in *State v. Body*, 2018-Ohio-3395, 117 N.E.3d 1024, ¶ 21-22:

> "Ohio courts have consistently held that in order to violate the obstructing official business statute a defendant must engage in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's lawful duties, as opposed to merely failing or refusing to cooperate or obey a police officer's request for information." *State v. Prestel*, 2d Dist. Montgomery No. 20822, 2005-Ohio-5236, ¶ 16. "A mere failure or refusal to respond to an officer's request does not constitute obstructing official business." (Citations omitted.) *State v. Crawford*, 2d Dist. Montgomery No. 25506, 2013-Ohio-4398, ¶ 17.
>
> However, "the total course of the defendant's conduct must be considered" as opposed to "viewing the acts of a defendant in isolation." (Citations omitted.) *State v. Overholt*, 9th Dist. Medina No. 2905-M, 1999 WL 635717, *2 (Aug. 18, 1999) (finding defendant's refusal to leave the scene and interference with an officer's attempts to complete an arrest, as well as profane outbursts, were sufficient to constitute the offense of obstructing official business). *See also N. Ridgeville v. Reichbaum*, 112

Ohio App.3d 79, 84, 677 N.E.2d 1245 (9th Dist.1996) (finding multiple affirmative acts taken together can be sufficient to establish a violation of R.C. 2921.31(A)). " 'Where the overall pattern of behavior is one of resistance, * * * officers may consider the totality of the events and need not point to a single act that rises to the level of obstruction.' " *Roseborough v. Trotwood*, S.D.Ohio No. 3:06-cv-129, 2007 WL 3402880, *5 (Nov. 13, 2007), quoting *Lyons v. Xenia*, 417 F.3d 565, 574 (6th Cir.2005). (Other citations omitted.)

{¶ 14} On July 24, 2023, the State filed supplemental authority to support its position that Morrow could himself be the person at risk of physical harm when the factfinder considered whether to elevate the degree of the offense. The State cited *State v. Gannon*, 9th Dist. Medina No. 19CA0053-M, 2020-Ohio-3075, ¶ 15 (" * * * we are mindful that [R.C. 2921.31(B)] is satisfied when a defendant increases the risk of physical harm to any person including himself."); *State v. Pineda*, 11th Dist. Ashtabula Nos. 2020-A-0011, 2020-A-0012, 2021-Ohio-1540, ¶ 110, citing *Gannon* at ¶ 15; and *State v. Williams*, 8th Dist. Cuyahoga No. 83574, 2004-Ohio-4476, ¶ 38 (defendant put his own safety in jeopardy while fleeing an officer on foot where cars "had to swerve around him to avoid hitting him.")

{¶ 15} At trial, the evidence regarding the risk of physical harm created by Morrow was as follows. Katherine Halterman testified that she was employed at the Tri-County Regional Jail as a licensed practical nurse on July 1, 2022. While in the booking area of the jail, she observed Morrow, in a booking cell, "kicking and hitting the door and

screaming and yelling." Halterman observed jail personnel remove Morrow from his cell and "then try to get him into a restraint chair, at which point he fought them, was thrashing around, yelling, screaming." As the officers continued to attempt to place Morrow in the restraint chair, "he was flailing around almost flipping the restraint chair backwards." Halterman heard Officer Ryan Bell advise Morrow, "If you spit on me again, that will be a felony." Thereafter, the officers were able to secure Morrow in the restraint chair.

{¶ 16} Halterman further testified that Bell had advised her that Morrow's saliva had "landed on his cheek and some had gotten into his eye"; she advised him to flush his eye with water, wash his face, and then proceed to the hospital. The stipulation regarding Morrow's status as a carrier of hepatitis was read into the record, and Halterman identified August 23, 2022 lab results from testing she ordered that reflected Morrow was positive for hepatitis C. According to Halterman, hepatitis C can be spread "through any bodily fluid, blood, saliva, mouth to mouth."

{¶ 17} Ryan Cantrell testified that he was a corrections officer at the Tri-County Jail on July 1, 2022. At the beginning of his shift that day, at 4:00 p.m., Cantrell learned that Morrow "had been in an escalated state throughout the day" and was agitated, upset and angry. Cantrell testified that Morrow was "hitting windows with his fists [and] donkey kicking the door," which caused concern for the facility and for Morrow. Cantrell described "donkey kicking" as "rear facing the door and kicking back towards [the] door striking the door with his foot." Cantrell stated that Morrow could have hurt himself by kicking the door that way: "break his foot, he could hit it the wrong way, fall down, land at an awkward angle, hurt himself that way." Cantrell testified that Morrow was repeatedly

ordered to cease his disruptive behavior, and eventually the officers decided to provide Morrow with a sack lunch rather than serve his lunch on a tray, because the tray could "be used as a weapon within the cell to either damage our facility or harm himself with it or harm others if they have to go in there and get it." Cantrell indicated that Morrow reacted by "throwing a fit over not getting a regular tray."

{¶ 18} Cantrell testified that jail policy on how to manage disruptive inmates begins with commands to cease the disruptive behavior; if the commands are unsuccessful, pepper spray may be used to gain compliance. If the misbehavior continues, officers may make use of the restraint chair to prevent the inmate "from damaging the facility or harming themselves or others." Cantrell's sergeant instructed that, if Morrow continued to kick the door, pepper spray would have to be used "as a next step of intervention." Cantrell then opened Morrow's cell door two to three feet and sprayed him with pepper spray on the right side of his face in a one- to two-second burst. Cantrell did not observe any indication that Morrow had been sprayed in the eyes, nose, or mouth, but he observed redness on the side of his face. Morrow began kicking the door again and then went to the sink in his cell to "wash himself down." According to Cantrell, Morrow's agitated state lasted a "few hours."

{¶ 19} Cantrell's sergeant eventually gave an order to place Morrow in the restraint chair, which was used to "ensure that [inmates] are not harming themselves or others" during a violent episode. Cantrell stated that the chair allows officers to restrain an inmate's arms, legs, and chest area. Officers Bell, Stroble, and Taylor assisted in placing Morrow in the chair, and Morrow "started to thrust and try to break free * * *, became

agitated again." Morrow was "screaming" and "threatening." According to Cantrell, the officers feared getting hit, kicked, or spit on, or potentially falling at an awkward angle, which could hurt them or the inmate. Cantrell stated that Morrow spit on Officer Bell while Morrow was in the restraint chair and Bell was "around his legs." Officer Stroble moved Morrow's face to the right to prevent him from spitting again.

{¶ 20} Officer Ryan Bell testified that when he arrived in the booking area on July 1, 2022, Morrow was angry about being given a sack lunch and "very belligerent." His testimony about Morrow's violent behavior, the commands that he cease the violent behavior, and the officers' concerns for his and their own safety was consistent with Cantrell's testimony. Bell stated that five minutes had elapsed between the time when Cantrell sprayed Morrow with pepper spray and Morrow's removal from the cell to be placed in the restraint chair. Bell stated that Morrow spit on him during the struggle; while Bell was attempting to strap in one of Morrow's feet, a "large wet spot" hit his face, with a portion reaching his left eye. Bell advised Morrow, "You continue to [do] that, you're going to get a felony."

{¶ 21} A surveillance video of the officers' placing Morrow in the restraint chair was played for the jury. Bell testified that after he had advised his shift supervisor about being spit on, a nurse had reviewed Morrow's medical history and it was decided that Bell should "be given Workers' Comp stuff" and then go immediately to the hospital. Bell stated that a couple of days later, Morrow apologized for his actions during their previous encounter. Bell stated that testing revealed that he had not been infected with hepatitis.

{¶ 22} In his defense, Morrow testified that he had kicked the cell door only one

time, and there "was nobody in any harm's way whatsoever." He testified that he had walked calmly to the restraint chair and allowed the officers to restrain him. Morrow stated that he had not intentionally spit on anyone. On cross-examination, Morrow stated that he had kicked the door twice and that the second time was after he had been warned that if he kicked the door again, he would be pepper sprayed.

{¶ 23} When it overruled Morrow's motion for acquittal on the obstructing official business charge, the court found that "based on the nature of the struggle to get the defendant into the restraining chair, it was more than a minor annoyance or irritation, but created a risk of physical harm by the aggressive actions of the defendant and the length of time it took." This conclusion was supported by the evidence. Morrow, having been in an agitated state for hours, acted affirmatively to obstruct the officers in the performance of their duties at the jail. Morrow did not merely fail to cooperate with the officers but engaged in an overall pattern of resistance. He initially created a risk of physical harm to himself by continuing to kick the door and hit the windows in his cell after being told not to do so. Cantrell stated that Morrow risked breaking his foot or falling down and sustaining injury. The officers' decision not to provide Morrow's lunch on a tray due to concern for his and their safety further angered Morrow. After spraying Morrow with pepper spray, the officers were ordered to place Morrow in the restraint chair, as their commands and the pepper spray had not ended the disruption. Morrow violently struggled to break free from officers while screaming at and threatening them, and the officers, who feared being kicked or hit by Morrow, acted to prevent injury to themselves and Morrow.

{¶ 24} The video of the struggle belies Morrow's testimony that he proceeded calmly to the restraint chair and allowed the officers to restrain him. Before he was brought out to the restraint chair, Morrow could be heard yelling loudly and unintelligibly from inside his cell. Before officers opened his cell door, an officer could be heard saying "get a spit mask," although one was never produced. When the cell door was opened, a defiant Morrow was brought out, and his demeanor was not calm but agitated; he continued yelling in an ear-piercing manner. When four fairly-large officers attempted to put Morrow in the chair, he continued to yell and scream, which was consistent with the testimony of Halterman, Cantrell, and Bell. While continually thrashing about, thrusting and bending his body in the chair, at one point Morrow nearly toppled the restraint chair backwards, requiring officers to set it right, while Morrow continued to yell. At another point an officer could be heard advising Morrow that if Morrow spit on him again, there would be a felony charge. The entire encounter trying to get Morrow into the restraint chair lasted over five minutes and 29 seconds.

{¶ 25} Having reviewed the entire record, we cannot conclude that the jury's verdict was unsupported by the evidence or that the jury clearly lost its way and created a manifest injustice. The jury credited the testimony of the State's witnesses on the obstructing official business charge, rather than Morrow's testimony, and we defer to the jury's assessment of credibility. The record reflects that Morrow acted with a purpose to prevent, obstruct, or delay jail personnel and hampered or impeded jail personnel in the performance of their lawful duties, namely maintaining order in the jail and preventing Morrow from harming himself or them, without privilege to do so. As such, Morrow's

assignments of error are overruled.

{¶ 26} Finally, we note that on July 28, 2023, the trial court filed a nunc pro tunc entry purporting to correct a clerical error in the imposition of post-release control in Morrow's judgment entry of conviction, citing this Court's decision in *State v. Grooms,* 2d Dist. Champaign No. 2022-CA-32, 2023-Ohio-2506. *See also* Crim.R. 36. However, " '[a]lthough a court generally may issue a nunc pro tunc entry any time, * * * a notice of appeal divests a trial court of jurisdiction to do so.' " (Footnote and citations omitted.). *State v. Donley,* 2017-Ohio-562, 85 N.E.3d 324, ¶ 173 (2d Dist.). Although a trial court's attempt to correct an error is commendable, the trial court lacked jurisdiction to file its amended judgment entry while this appeal was pending, and its nunc pro tunc entry had no legal effect. However, nothing precludes the trial court from simply refiling its amended judgment entry after this appeal has been resolved.

{¶ 27} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.