[Cite as *State v. Wilkerson*, 2025-Ohio-1279.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

    Appellee

v.

LAMONT L. WILKERSON

    Appellant

:
:
:
:
:
:
:
:
:
:
:

C.A. No. 30196

Trial Court Case No. 2023 CR 01099

(Criminal Appeal from Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on April 11, 2025

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Lamont L. Wilkerson appeals from his convictions in the Montgomery County Court of Common Pleas for failure to comply and obstructing official business. He claims that his conviction for failure to comply was based on insufficient evidence, that the trial court should have granted his Crim.R. 29 motion on obstructing official business, and that

the court failed to consider R.C. 2921.331(C)(5)(b) at sentencing. For the following reasons, Wilkerson's conviction for obstructing official business will be vacated. His conviction for failure to comply will be affirmed.

## I. Facts and Procedural History

{¶ 2} During the evening of February 16, 2023, a detective involved in a special proactive enforcement detail was conducting surveillance at a gas station when a Mitsubishi SUV caught his attention. After following the vehicle and observing several traffic violations, the detective instructed a deputy in a marked cruiser to initiate a traffic stop. When the deputy attempted to do so, the vehicle sped away. The deputy initially followed, reaching approximately 60 mph in a 35-mph zone, but based on policy governing the pursuit of fleeing vehicles, he quickly terminated his pursuit. However, the vehicle was being tracked by a law enforcement helicopter, which relayed the vehicle's location to the officers involved in the detail. The pilot tracked the vehicle's path and observed the driver park behind a residence and hurry inside.

{¶ 3} Numerous law enforcement officers responded to the residence, surrounded it, and asked the driver of the vehicle to come out. They attempted to negotiate with the occupants, but their efforts were initially unsuccessful. Ultimately, Wilkerson came out of the home and was arrested. While speaking with another deputy, he admitted to being the driver.

{¶ 4} Three months later, Wilkerson was indicted on failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), a third-degree felony, and obstructing official business in violation of R.C. 2921.31(A), a second-degree

misdemeanor. He moved to suppress the evidence against him, claiming that the attempted stop and his subsequent arrest were unlawful and that the statements he made to police were involuntary and obtained in violation of his *Miranda* rights. After a hearing, the trial court overruled the motion. Wilkerson later filed a notice of alibi, claiming that he was with others at the residence where he was arrested at the time of the pursuit.

{¶ 5} The matter proceeded to a jury trial, during which the State offered the testimony of four law enforcement officers and related exhibits. Wilkerson presented an alibi witness. After deliberating, the jury found Wilkerson guilty of both charges. It further found that Wilkerson's operation of the motor vehicle had caused a substantial risk of serious physical harm to persons or property. At sentencing, the trial court imposed 24 months in prison for failure to comply, to be served concurrently with a 90-day sentence for obstructing official business. The court also suspended Wilkerson's driver's license for ten years and ordered him to pay court costs.

{¶ 6} Wilkerson appeals from his convictions, raising three assignments of error. We will address them in a manner that facilitates our analysis.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 7} In his first assignment of error, Wilkerson claims that the State failed to present sufficient evidence that he was the driver of the vehicle to support the charge of failure to comply. Although couched in terms of sufficiency of the evidence, Wilkerson relies on the totality of the evidence, including the testimony of his alibi witness, which implies a manifest-weight argument. We therefore will construe his appellate brief as challenging his conviction on both grounds. Wilkerson's third assignment of error claims

that the trial court should have granted his Crim.R. 29(A) motion on obstructing official business, which also concerns the sufficiency of the evidence. Accordingly, we will address both assignments of error together.

**A. Relevant Legal Standards**

{¶ 8} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a claim based on the sufficiency of the evidence. *State v. Page*, 2017-Ohio-568, ¶ 7 (2d Dist.), citing *State v. Sheppeard*, 2013-Ohio-812, ¶ 51 (2d Dist.). "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 9} In reviewing the trial court's denial of a Crim.R. 29(A) motion at the end of the State's case, we consider only the evidence that had been presented prior to the motion. *State v. Jackson*, 2022-Ohio-2805, ¶ 9 (2d Dist.); *State v. Powell*, 2018-Ohio-4693, ¶ 22 (2d Dist.), citing *Sheppeard* at ¶ 51. For Crim.R. 29(A) motions made after the defense's evidence, we consider all the evidence admitted at trial. *State v. Stone*, 2024-Ohio-177, ¶ 9 (2d Dist.).

{¶ 10} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 11} We note that Wilkerson's appellate brief refers to evidence that was presented at the hearing on his motion to suppress and information discussed in a sidebar discussion. In reviewing the sufficiency of the State's evidence at trial, we are limited to the evidence that was presented to the jury.

**B. The Evidence at Trial**

{¶ 12} According to the State's evidence at trial, on the evening of February 16, 2023, Deputy Joshua Potter, Deputy (now Detective) Joshua Samples, and Detective Frederick Zollers, all from the Montgomery County Sheriff's Office, were participating in a special proactive enforcement detail. Troy Hess, an air interdiction agent (federal law enforcement pilot) with Customs and Border Protection, Office of Air and Marine, provided

air support in an unmarked Airbus H125 helicopter, which was equipped with a camera that could provide the speed of vehicles that it tracked.

**{¶ 13}** Deputy Potter explained that several detectives in unmarked vehicles, along with air support, were watching for certain events. When detectives saw something that interested them, they would contact the pilot, who would lock the helicopter's camera system onto that vehicle. The detectives would communicate the vehicle's location and the direction it was traveling, along with the traffic violations they saw, to the uniformed officers in marked cruisers and ask the marked units to conduct traffic stops.

**{¶ 14}** During the February 16 detail, Detective Zollers conducted surveillance at the Valero gas station at 2800 Philadelphia Drive, a high crime area. Zollers indicated that he had previously arrested people there for weapons and firearm violations, stolen motor vehicles, and warrants. That evening, a silver Mitsubishi Montego SUV with an out-of-state license plate caught his attention. Detective Zollers saw inside the vehicle, and the only occupant was the driver, whom Zollers identified at trial as Wilkerson. While the Mitsubishi SUV was parked at a pump, a female entered the vehicle and it departed, heading eastbound on West Siebenthaler Avenue.

**{¶ 15}** At approximately 6:45 p.m., Detective Zollers asked Hess to lock onto the Mitsubishi SUV that was pulling out of the Valero gas station. *See* State's Ex. 3. Detective Zollers followed the Mitsubishi in an unmarked vehicle and noticed several traffic violations. Soon after, Zollers asked Deputy Potter, who was in a marked unit, to conduct a traffic stop on the Mitsubishi SUV. Potter heard from Detective Zollers and Hess that the vehicle had made numerous traffic violations. Potter also observed the

SUV make a wide right turn, causing the left tires to cross the line.

{¶ 16} The Mitsubishi turned right off of West Siebenthaler and looped around until it again prepared to turn right on West Siebenthaler. When the Mitsubishi, Zoller's vehicle, and Potter all were heading eastbound on Siebenthaler, Deputy Potter drove around the detective's vehicle and activated his lights and siren. See State's Ex. 1. The Mitsubishi accelerated away from Deputy Potter, making no attempt to stop. While crossing North Main Street, the vehicle went left of center into oncoming traffic to pass another vehicle, causing that vehicle to swerve and stop at the edge of the roadway. Deputy Potter testified that he had reached 60 mph and the Mitsubishi was still pulling away from him; the speed limit there was 35 mph. It was dark outside, there was heavy traffic, and the weather was cool, wet, and rainy.

{¶ 17} Deputy Potter terminated his high-speed pursuit around North Main Street. He stated that it was against department policy to pursue a vehicle for traffic infractions. However, the air surveillance continued, and Hess called out the Mitsubishi's path of travel, which included business and residential areas. As Wilkerson drove, he failed to stop at multiple stop signs, recklessly passed three vehicles on Riverside Drive, improperly crossed the double yellow line multiple times, ran red lights, went into the wrong lane from a curve, improperly passed other vehicles, and drove at a high rate of speed. The Mitsubishi drove to a two-story residence on Negley Place in Dayton and parked behind the house. Hess saw people exit the vehicle and run into the back door of the house.

{¶ 18} Detective Zollers, Deputy Potter, and other officers followed the path the

driver was taking. Zollers was the first to arrive, and he parked at the back of the home. He could see people looking out an upstairs window. Zollers stated that they did a "contain and call-out on the PA system," telling the driver that they knew he was inside and to please come out. By the time Potter arrived at the Negley house, the residence was surrounded by other officers. Detectives were "making contact, talking to people through the window and through the door, trying to convince somebody to come out of the house." Potter was not close enough to hear exactly what was being said. Zollers stated that he could see through a window that Wilkerson was inside; Wilkerson had taken his shirt off but was wearing a hat.

{¶ 19} Deputy Samples, who was also driving a marked cruiser, responded to the Negley home. When he arrived, officers were setting up a perimeter around the house, and others were at the front door, knocking and initiating contact with the occupants. Samples ended up with the detectives on the front porch, who were saying that they knew a vehicle had come there, that the people from the vehicle were inside the house, and that they needed to come out. At some point, Detective Zollers left the residence to go back to his office to prepare a search warrant so that he could enter the residence and arrest Wilkerson.

{¶ 20} More than 30 minutes after the officers arrived, but before Zollers prepared the search warrant, Wilkerson exited the home. Deputy Samples explained to Wilkerson what was going on and placed him in handcuffs. Samples then took Wilkerson to his cruiser, informed him of his *Miranda* rights, and spoke with him about the pursuit. Wilkerson told Deputy Samples that he had run from the police because he did not have

a valid driver's license and that he was paranoid because he smokes weed. Samples transported Wilkerson to the Montgomery County Jail. A woman at the home located the Mitsubishi's key and provided it to an officer.

{¶ 21} Other officers informed Deputy Potter of Wilkerson's identity, and the deputy completed a traffic citation for failure to obey a stop sign and driving under suspension. *See* State's Ex. 2. Wilkerson later pled guilty to failing to obey a traffic control device related to this incident and was found guilty of driving without a valid license. State's Ex. 6. Deputy Potter also completed paperwork to tow the vehicle.

{¶ 22} Wilkerson presented one witness at trial, his aunt, who lived at the Negley residence. She testified that she was home with Wilkerson, another nephew, and two nieces on February 16, 2023. After taking pain medication, she went upstairs to sleep at about 6:30 p.m. She was awakened around 7:00 p.m. by the sound of law enforcement officers kicking and banging on her door. She then noticed that her seven grandchildren, ages three to nine years old, were there. The children were upstairs, crying and scared. She indicated that Wilkerson was downstairs playing a video game and falling asleep.

{¶ 23} Wilkerson's aunt testified that she was afraid to open the door. She indicated that the officers at her front door were telling her that, if she did not, they were "going to hit me with a nuisance. They [were] going to get a search warrant. Every adult in my house was going to jail and all the kids are going to Children Service." They also threatened to kick down the door. She said that Wilkerson eventually went out of the house with his hands up, and the officers left. She further stated that officers had gone

into her detached garage and "tore that up to where put holes in three TVs."

### C. Failure to Comply

{¶ 24} On appeal, Wilkerson claims that the State did not prove that he was the driver of the vehicle. However, Detective Zollers testified that he saw Wilkerson in the driver's seat of the Mitsubishi while it was at the gas station, and he identified Wilkerson as the driver at trial. Aerial surveillance video tracked the vehicle from the gas station to the residence on Negley Place, and both Hess and the video indicated that the driver had entered the residence. Zollers stated that he saw the driver inside the home, and Wilkerson admitted to being the driver after he left the house and was taken into custody. The State's evidence was sufficient to prove that Wilkerson was the driver of the vehicle.

{¶ 25} Wilkerson asserts that his confession to being the driver was influenced by the officers' threats to break down the door to the house, arrest the adults, and have the children placed with the children services agency. Deputy Samples's body camera video substantiated that these threats were made. *See* State's Ex. 4. Wilkerson further states that law enforcement officers did not attempt to obtain surveillance video from the Valero gas station, and neither Deputy Potter nor Detective Zollers provided a description of the driver.

{¶ 26} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Wilkerson was the driver of the Mitsubishi SUV. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.). Upon review of the evidence, we cannot conclude that the jury lost

its way when it ostensibly credited the State's evidence and found that Wilkerson committed failure to comply with an order or signal of a police officer.

{¶ 27} Wilkerson's first assignment of error is overruled.

### D. Obstructing Official Business

{¶ 28} Wilkerson further asserts that the trial court erred in denying his Crim.R. 29(A) motion for acquittal on obstructing official business.

{¶ 29} Under the obstructing official business statute, "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 30} To be guilty of obstructing official business, an individual must commit an overt act done with an intent to obstruct a public official, such as a police officer, and the act must succeed in actually hampering or impeding that officer. *State v. Easterling*, 2019-Ohio-2470, ¶ 35 (2d Dist.), citing *State v. Davis*, 2017-Ohio-5613, ¶ 37 (2d Dist.). "R.C. 2921.31(A) thus includes five essential elements: (1) an act by the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of

a lawful duty, and (5) the defendant so acts without privilege." *State v. Morrow*, 2023-Ohio-2891, ¶ 12 (2d Dist.), quoting *State v. Kates*, 2006-Ohio-6779, ¶ 21 (10th Dist.).

{¶ 31} "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." (Citations omitted.) *Id.* To satisfy the hampering or impeding element, there must be "some substantial stoppage of the officer's progress." *State v. Armstrong-Carter*, 2021-Ohio-1110, ¶ 57 (2d Dist.), citing *State v. Ellis*, 2011-Ohio-2967, ¶ 59 (2d Dist.). The totality of the defendant's conduct should be considered. *Id.*, citing *State v. Body*, 2018-Ohio-3395, ¶ 22 (2d Dist.).

{¶ 32} The State argues, as it did at trial, that Wilkerson committed obstructing official business by exiting the vehicle, running into his aunt's house, and taking cover. (It expressly does not rely on his fleeing in the car and driving to his aunt's home, which was addressed by the failure to comply charge.) It contends that Wilkerson's actions – his reckless driving between Siebenthaler and Negley Place and his running into the house – reflected an intent to evade the police officers that he knew were after him. Wilkerson counters that this behavior was insufficient to demonstrate a purpose to prevent, obstruct, or delay the performance of an official act.

{¶ 33} We find this to be a close question. The State's evidence established that Deputy Potter attempted to initiate a traffic stop while Wilkerson was driving eastbound on Siebenthaler Avenue. Potter activated his lights and siren, and Wilkerson sped away. The deputy's high-speed pursuit was very brief; Potter turned off his lights and siren and terminated his pursuit in just under 20 seconds. The deputy pulled his cruiser into a turn

lane and let several unmarked vehicles pass him before he continued without his lights and siren. He explained: "I don't pursue it. I don't push it. Air is going to call it out stop by stop and we're going to get him when he stops. . . I'm not in pursuit. I'm not chasing." Trial Tr. 85.

{¶ 34} Wilkerson continued to be tracked by the unmarked helicopter, and with information from Hess, law enforcement officers followed Wilkerson to his aunt's home. Detective Zollers indicated they were trying to maintain a safe distance and parallel Wilkerson's movements until he stopped. While Wilkerson drove recklessly throughout his drive to the Negley Place home, the aerial surveillance video reflects that the officers in automobiles were a substantial distance behind him for most of that time. It took Wilkerson approximately six-and-a-half minutes to get to his aunt's house; Detective Zollers, the first law enforcement officer to arrive, did not get there until two minutes later.

{¶ 35} To be sure, fleeing from law enforcement officers who are lawfully attempting to detain the suspect under *Terry* is an affirmative act that hinders or impedes the officer in the performance of the officer's duties as a public official and, thus, constitutes obstructing official business. *E.g., State v. Holloway*, 2018-Ohio-4636, ¶ 37 (2d Dist.); *State v. Harris*, 2005-Ohio-4553, ¶ 16 (10th Dist.). However, the State expressly declined to seek a conviction for obstructing official business based on Wilkerson's failure to comply with Deputy Potter's attempt to initiate a traffic stop and his flight to the Negley address. Accordingly, we need not discuss whether the State's evidence regarding his fleeing from law enforcement in the Mitsubishi constituted obstructing official business.

**{¶ 36}** When Wilkerson arrived at the Negley Place house, there were no law enforcement officers present or even pursuing closely behind him, the helicopter notwithstanding. Although the officers intended to arrest Wilkerson when he ultimately stopped driving, law enforcement officers were not, at that time, attempting to do so. Rather, the officers were en route to the house, and Wilkerson did nothing to impede that. His leaving the SUV and hurrying into his aunt's home did not hinder any concurrent effort by law enforcement to arrest him. Under the specific facts of this case, the evidence thus did not support a conclusion that Wilkerson engaged in any act that hampered the officer's performance of their duties when he left his vehicle and entered his aunt's home.

**{¶ 37}** The fact that Wilkerson's presence inside the home ultimately delayed his apprehension does not change this conclusion. Wilkerson's behavior after the officers arrived amounted to failing to cooperate with their request that he come out. We have repeatedly held, however, that "[a] mere failure or refusal to respond to an officer's request does not constitute obstructing official business." *E.g.*, *State v. Crawford*, 2013-Ohio-4398, ¶ 17 (2d Dist.); *Morrow,* 2023-Ohio-2891, at ¶ 13 (2d Dist.); *Armstrong-Carter,* 2021-Ohio-1110, at ¶ 57 (2d Dist.). Moreover, Wilkerson's removing his shirt and putting on a hat had no effect on the officer's efforts to arrest him. Accordingly, the trial court should have granted Wilkerson's Crim.R. 29(A) motion as to the charge of obstructing official business.

**{¶ 38}** Wilkerson's third assignment of error is sustained.

### III. Sentencing on Failure to Comply

**{¶ 39}** In his second assignment of error, Wilkerson claims that the trial court erred

in failing to make the requisite findings under R.C. 2921.331(C)(5)(b) when sentencing him for failure to comply.

{¶ 40} Wilkerson was found guilty of violating R.C. 2921.331(B), which states: "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." The jury further found that his operation of the motor vehicle caused a substantial risk of serious physical harm to persons or property. R.C. 2921.331(C)(5)(a)(ii).

{¶ 41} The sentencing portion of the failure to comply statute provides that, if a police officer pursues an offender who is violating division (B) of this section and division (C)(5)(a) of this section applies, the sentencing court, in determining the seriousness of an offender's conduct for purposes of sentencing the offender for a violation of division (B) of this section, shall consider, along with the factors set forth in sections 2929.12 and 2929.13 of the Revised Code that are required to be considered, all of the following:

(i) The duration of the pursuit;

(ii) The distance of the pursuit;

(iii) The rate of speed at which the offender operated the motor vehicle during the pursuit;

(iv) Whether the offender failed to stop for traffic lights or stop signs during the pursuit;

(v) The number of traffic lights or stop signs for which the offender failed to stop during the pursuit;

(vi) Whether the offender operated the motor vehicle during the pursuit without lighted lights during a time when lighted lights are required;

(vii) Whether the offender committed a moving violation during the pursuit;

(viii) The number of moving violations the offender committed during the pursuit;

(ix) Any other relevant factors indicating that the offender's conduct is more serious than conduct normally constituting the offense.

R.C. 2921.331(C)(5)(b).

**{¶ 42}** The trial court is not required to make express findings under R.C. 2921.331(C)(5)(b) in its judgment entry or during the sentencing hearing, nor does it need to reference the statutory factors. *State v. Yarbrough*, 2015-Ohio-1672, ¶ 16 (2d Dist.); *State v. Standifer*, 2022-Ohio-2426, ¶ 19 (2d Dist.). Rather, absent any indication that the trial court failed to consider these factors, we presume that the trial court acted properly. *Id.*

**{¶ 43}** Here, the trial court told Wilkerson at sentencing:

[T]he Court is aware of all the facts of this case. Being privy to the trial, I watched the videos that were taken in this matter. I've also reviewed all those factors I'm considered – that I'm required to consider – the purposes and principles of sentencing Ohio Revised Code 2929.11. Seriousness and recidivism factor is 2929.12. Your actions, sir, were very lucky that no one was seriously hurt or killed based upon your actions in this case. After

considering all those factors, in regards to the failure to comply, a felony of the third degree, I'm going to sentence you to a term of 24 months in the correction reception center.

Although the trial court did not expressly mention that it had considered the factors listed in R.C. 2921.331(C)(5)(b) as part of its analysis, there is no indication that the trial court failed to consider those factors. The court suggested that it did when it commented on the dangerousness of Wilkerson's driving.

{¶ 44} Wilkerson's second assignment of error is overruled.

## IV. Conclusion

{¶ 45} Wilkerson's conviction for obstructing official business will be vacated. His conviction for failure to comply will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.